[No. A132667. First Dist., Div. Five. Apr. 20, 2012.]

In re M.L., a Person Coming Under the Juvenile Court Law.
ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Appellant, v.
M.P. et al., Defendants and Respondents;
D.M. et al., Interveners and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.F.

## Counsel

Donna Ziegler, County Counsel, and Gabriella Raymond, Deputy County Counsel, for Plaintiff and Appellant.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Respondent T.L.

Mary R. Williams, under appointment by the Court of Appeal, for Defendant and Respondent M.P.

Leslie A. Barry, under appointment by the Court of Appeal, for Intervener and Respondent M.P.

Seth F. Gorman, under appointment by the Court of Appeal, for Intervener and Respondent D.M.

Valerie N. Lankford, under appointment by the Court of Appeal, for Minor.

## OPINION

**NEEDHAM, J.**—After placing a dependent child in the home of her grandparents on an emergency basis, the Alameda County Social Services Agency (Agency) discovered that the grandfather had a criminal history rendering the home ineligible as a formal relative placement. (Welf. & Inst. Code, § 361.4.)[1] The Agency moved the child from the grandparents' home and filed a petition under section 387, while the grandfather sought a criminal history exemption that would have allowed the home to be considered as a placement. (§ 361.4, subd. (d)(2).) This exemption request was ultimately denied by the Agency.

In an unfortunately protracted and possibly unnecessary proceeding under section 387, the juvenile court reviewed the propriety of the move from the grandparents' home and the Agency's decision to deny the grandfather's criminal records exemption. After a series of hearings over 17 months, the court dismissed the Agency's section 387 petition and ordered the child placed with her grandparents. The Agency appeals, arguing that the placement order was unauthorized in light of the grandfather's unexempted criminal history, and that the juvenile court should have granted the section 387 petition. The Agency also argues that the court exceeded its authority by ordering reunification services and transportation assistance to facilitate the transition to the grandparents' home; that it erred when it found reasonable services had not been provided to the child; and that it should have identified a permanent plan for the child.

We agree with the Agency that the juvenile court erred in dismissing the section 387 petition and ordering the child placed with the grandparents. In light of this conclusion, the order requiring the Agency to provide reunification services and transportation assistance must also be set aside.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Initial Dependency/Family Maintenance Plan*

M.L. was born in July 2008 to T.L. (father) and M.P. (mother), each of whom has a long history of criminal activity and substance abuse. The

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

parents have six other children, all of whom were living outside the home, and some of whom had been the subjects of juvenile dependency proceedings.

The Agency filed a dependency petition alleging that both mother and M.L. had tested positive for opiates and alcohol at M.L.'s birth; that mother had a history of polysubstance abuse; and that the parents' other children were living outside the home due to the parents' drug use, criminal activities and incarcerations. On August 13, 2008, the juvenile court declared M.L. a dependent under section 300, subdivisions (b) and (j), and placed her in the custody of her parents under a family maintenance plan. (§ 362, subd. (b).)

According to the status report prepared by the Agency for the January 2009 review hearing, the parents had to leave their home and were looking for other housing while "living with relatives when they can." By the time of the July 2009 status hearing, the family had moved into the home of M.L.'s paternal grandparents, M.P. (grandmother) and D.M. (grandfather). In October 2009, the parents agreed to continue drug testing and treatment and to continue residing with the grandparents as a condition of retaining M.L. in their care.

B. *Section 387 Petition Removing M.L. from the Parents' Custody*

On December 10, 2009, the Agency filed a supplemental petition under section 387, alleging that the parents had not complied with drug treatment and testing requirements; that they were no longer living with the paternal grandparents; and that father had been incarcerated in San Quentin prison for theft and drug possession.[2] The detention report filed by the Agency advised the court that M.L. had been taken from the custody of her parents on December 8, 2009, and was allowed to remain in her grandparents' home after social worker Eddy Herrera approved an emergency relative placement. The report stated that the grandparents' home "will be assessed for relative approval" by Herrera, and "[t]here is a relative who is able, approved, and willing to care for the child(ren)." On December 8, 2009, grandfather signed a criminal records statement under penalty of perjury in which he denied having been convicted of a crime in California or another jurisdiction.

At the detention hearing on December 11, 2009, the court removed M.L. from her parents' custody and "[c]ommitted [her] to the care, custody and control of the . . . Agency to be placed in a suitable family home or private institution." It also adopted certain findings in the detention report, which

---

[2] The record also contains an apparently identical supplemental section 387 petition date-stamped December 8, 2009. We treat the petition that was date-stamped on December 10 as the operative pleading, as that is the version referred to by the juvenile court in its detention order.

included the statement, "there is a relative who is able, approved, and willing to care for the child(ren)."

The Agency filed a jurisdictional/dispositional report on the section 387 petition reiterating that M.L. had been placed with her grandparents in a relative emergency placement. The report stated that M.L. was doing well in the home of her grandparents, with whom she appeared comfortable and bonded. It characterized the placement as being in the home of "an approved relative" (versus an approved nonrelative extended family member, a licensed foster parent, or a licensed emergency foster parent—the other preprinted boxes that could have been checked in that section of the report).

A combined jurisdictional/dispositional hearing was held on the section 387 petition on January 13, 2010. The court set aside the previous order placing M.L. with her parents, denied them reunification services, and set the case for a section 366.26 hearing on May 11, 2010, to select a permanent plan. M.L. was "[c]omitted . . . to the care, custody and control of the . . . Agency to be placed in a suitable family home or private institution," and the court adopted findings from the Agency's report that characterized her current placement as being with "an approved relative." The order also stated that visitation with the grandparents was "appropriate" and was to be arranged at the discretion of the Agency.

## C.  Live Scan Results—Grandfather's Criminal History

As part of the process for approving the grandparents' home for placement, the Agency conducted a "Live Scan" to investigate their criminal history.[3] Although grandmother had no criminal history, grandfather's rap sheet revealed the following: a 1965 conviction for petty theft; a 1969 conviction for driving at an unsafe speed; a 1970 conviction for driving with a suspended license; a 1977 conviction for reckless driving; a 1980 conviction for malicious mischief/vandalism; a 1983 conviction for resisting arrest; a 1995 conviction for possession of a controlled substance; a 2000 conviction for possession of a controlled substance; and various other arrests, including one for domestic violence in February 2009. Under state law, grandfather's convictions disqualified him as a placement for M.L. unless he obtained a criminal records exemption from the Agency. (See § 361.4, subd. (d).)

---

[3] Live Scan is an electronic fingerprinting system that provides a vehicle for quickly checking an individual's criminal background. (See Health & Saf. Code, § 1522.04; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2005) 126 Cal.App.4th 144, 149, fn. 2 [24 Cal.Rptr.3d 256] (*Sencere P.*).)

D. *Second Section 387 Petition and Removal of M.L. from Grandparents' Home*

On March 26, 2010, the Agency filed a supplemental section 387 petition alleging that the grandparents were unable to safely care for M.L. in that both of them had used drugs while she was living in their home and grandmother had been diagnosed with a mental health condition that had prevented her from becoming a caretaker for a sibling of M.L.'s who was declared a dependent in Contra Costa County. The petition further alleged, "Approximately four months ago, the paternal grandparents were advised that the paternal grandfather must submit to a standard exemption in order for the home to be cleared for placement. For the past four months, the paternal grandfather has not cooperated with the exemption process."

The detention report filed in connection with the section 387 petition indicated that M.L. had been taken into protective custody on March 24, 2010, and placed in a licensed foster home. It explained, "On 3/24/10, a Team-decision Making meeting was held for the purpose of consideration for a change in placement. The primary concern centered around the placement that could not be approved in the home of the paternal grandparents in that the child was placed only on an emergency basis in December 2009. To explain, initially the child was placed with the parents under the condition that they remain in the home of the paternal grandparents, in addition to other requirements set forth in their case plan. About seventeen months after the in-home order, the child was removed from the care of the parents, yet she was allowed to remain in the home of the paternal grandparents. Fast forward to early December 2009 (to date), the paternal grandfather was informed that he must fulfill the process for a Standard Exemption based on his criminal record; however, he never did. In addition, the agency received information from a worker in Contra Costa County alleging ongoing substance abuse by the paternal grandparents, as well as mental health issues on behalf of the paternal grandmother. Last month, the primary worker, Jenaiah Jones, witnessed concerns about the grandparents' behavior, particularly the paternal grandmother during a recent home visit. . . ."

On March 29, 2010, the court found a prima facie case that removal was necessary (§ 319). On April 22, 2010, the Agency filed an amended supplemental section 387 petition deleting the allegations that the grandparents had used drugs. The grandparents, who sought to have M.L. returned to their home, were granted de facto parent status in May 2010.

E. *First Phase of Hearing on Section 387 Petition*

The first portion of the contested hearing on the amended supplemental section 387 petition was held over several days between June 2010 and

October 2010, while the hearing under section 366.26 (initially set for May 11, 2010) was continued. The following evidence was presented on the section 387 petition:

### 1. *Social Worker Eddy Herrera*

Eddy Herrera was the social worker responsible for the placement of M.L. with the grandparents after she was detained outside her parents' custody in early December 2009. He testified that although grandfather had signed a document on December 8, 2009, indicating that he had no criminal history, grandfather had told Herrera that he had some "minor indiscretions years ago." On December 9, 2009, Herrera did an initial check of the grandparents' criminal history using CLETS (California Law Enforcement Telecommunications System) and CACI (Child Abuse Central Index), which revealed no "hits."[4] Based on this information, he approved M.L.'s placement in the grandparents' home on an emergency basis.

Before Herrera could approve the grandparents' home for a more permanent placement, a Live Scan based on their fingerprints was required. The Scan revealed that grandfather had nine criminal convictions between 1965 and 2000, and an arrest for spousal abuse in 2009. Herrera advised grandfather that his convictions disqualified him as a placement for M.L. unless he obtained a criminal records exemption from the Agency. (See § 361.4, subd. (d).) Grandfather hired an attorney to assist in this process, but had difficulty obtaining records from some of the older cases, which dated from the 1960's and 1970's. Herrera believed grandfather had been cooperative in gathering what information he could, but it was also difficult for the Agency to obtain these records, which came from different jurisdictions. The exemption application had not yet been resolved because the Agency was still gathering information from other jurisdictions.

### 2. *Social Worker Rachael Sims*

Social worker Rachael Sims testified that M.L. could not be returned to the grandparents' home because a criminal exemption had not been granted and

---

[4] CLETS is an automated system used to track a person's criminal history (rap sheet). (*People v. Robinson* (2010) 47 Cal.4th 1104, 1128 [104 Cal.Rptr.3d 727, 224 P.3d 55].) CACI is an index of all reports of child abuse and severe neglect made to the state Department of Justice under Penal Code section 11169. (See *Saraswati v. County of San Diego* (2011) 202 Cal.App.4th 917, 921, fn. 1 [135 Cal.Rptr.3d 671].)

the home had not, therefore, been approved. In her opinion, the document grandfather had submitted to explain his criminal history as part of the exemption process did not show insight.[5] Sims questioned whether the home was safe, given that grandfather had been arrested in 2009 for domestic violence against grandmother.

Sims also had concerns about grandmother's mental health. She had spoken to a social worker in Contra Costa County who thought grandmother was delusional. On the day of the detention hearing on the section 387 petition, grandmother had told Sims that she could not recall whether she had been diagnosed with a mental illness or had received mental health treatment. Grandmother also left Sims a series of incomplete phone messages about M.L.'s pediatrician that were of concern. Sims acknowledged that there were no signs the grandparents had abused M.L., and that hair follicle drug tests had yielded negative results. Grandmother admitted using drugs in the past, but said she had been clean for 10 to 15 years.

---

[5] Grandfather provided the following handwritten explanation as part of the exemption process: "This is in place of police reports from my Li[v]e Scan. [¶] (Sept 27, 1965) [Petty Theft] 1. I do not remember this incident exactly. However it must have been something very small. At that time in 1965 I was in the military and home on leave[.] [¶] (Mar 5, 1969) [driving at unsafe speed] 2. In the late 60's I was a young man showing out as some young men do and going a few miles over a safe speed limit. [¶] (Dec 18, 1970) [driving with a suspended license] 3. In 1970 I was 25. I was driving on [a] suspended license and speeding. I don't remember exactly what my punishment was but I think I spent a few days in jail. [¶] (Sept 9, 1977) [reckless driving] 4. I had been drinking and had drank to[o] much and trying to make it home. At which time I turned to[o] sharp and hit a one way sign. At which time I was charged with destruction of city property. I had to pay a fine and was placed on probation. After a few days in jail. [¶] (Feb 19, 1980) [malicious mischief/vandalism] 5. To the best of my knowledge I don't remember this incident exactly. But evidently I was ordered to pay a fine and did so. [¶] (July 23, 1983) [resisting arrest] 6. This was a misunderstanding between me and my ex wife. After which time was rectified. During those times all a woman had to do was to say a man did something to her and they would bring half the police force as if he com[m]itted a murder. And they wanted you to respect them but they would disrespect you and talk down to you[.] [¶] (June 3, 1995) [possession of a controlled substance] 7. By being stupid and in the wrong company. I was holding a package for my so called friend when the police pulled up and they caught me with cocaine and charged me with poss[ess]ion for sale. [¶] [2000, possession of a controlled substance] 8. The only thing that I remember about this incident is that I was arrested for possession of narc [*sic*] controlled substance. Did a few day[s] in jail. At which time I was ordered to appear in court and put on probation. I then moved to Concord and was later arrested for a violation. And failure to appear[.] [¶] (June 2, 2003) [arrest on warrant] 9. The police came to the house looking for someone and asked everyone for ID. Then they discovered that I had a warrant out of Oakland and arrested me. [¶] [2009 domestic violence arrest] 10. This was just a misunderstanding between [the grandmother] and I. I did 1 or 2 days in jail and charges were dismissed. [¶] Since [this] incident I am now receiving marriage counseling from my pastor. I have also completed Prop 36. Here are some documents bearing this out."

### 3. *Social Worker Jenaiah Jones*

Adoptions worker Jenaiah Jones had been assigned to M.L.'s case from January 2010 to June 2010 and had visited the grandparents' apartment while M.L. was still living there. Before one of these visits, grandmother called her and said they were low on food and diapers, so Jones got some gift cards before going over. She called grandmother when she arrived at the apartment gate and grandmother said she would come down, but after waiting for about 15 minutes, Jones was let inside by another resident and went up to the apartment. Grandmother answered the door wearing sunglasses and said she and M.L. had been about to take a nap.

### 4. *SEED Social Worker Benjamin Budnitz*

Benjamin Budnitz was M.L.'s social worker through the Agency's SEED program (Services to Enhance Early Development) and supervised visits between M.L. and her grandparents after she was taken from their home. The initial weekly visits were an "emotional rollercoaster" for M.L., who did not respond well to her grandparents. During later visits, M.L. was comforted by having her foster mother in or near the room.

### 5. *Grandmother*

Grandmother testified that M.L. had lived with the grandparents for about a year and four months total (including the time that the parents were also in the house) and that she had no specific concerns about M.L.'s development during that time. She took valium for her nerves in 2009 and had received Supplemental Security Income for a nervous condition since 1974, but had never been hospitalized for a psychiatric illness. Asked about the 2009 incident in which grandfather had been arrested for domestic violence, grandmother said that they were having a "debate" and he had grabbed her arms trying to "calm [her] down." She called the police so they would come out and help them with their "debate."

### 6. *Grandfather*

When grandfather took the stand, he characterized the 2009 incident leading to his arrest for domestic violence as a "misunderstanding" that occurred while he was drinking alcohol and had "restrained" his wife. He had sought counseling with his pastor and had otherwise been clean and sober for eight to 10 years. He had completed a drug program while incarcerated in 2003. Grandfather was willing to adopt the minor if necessary, but did not know what would happen with the parents and thought M.L. might return to them if they "got themselves straight."

### F. Denial of Criminal Records Exemption and Separation of Grandparents

In October 2010, while the hearing on the section 387 petition was ongoing, the Agency advised the court that grandfather's request for a criminal records exemption had been denied. The grandparents sought to challenge this decision as an abuse of discretion, and the court asked the Agency to produce the personnel involved in the exemption process at the next hearing. The Agency objected to the court's review of its denial of the exemption, arguing that the grandparents were required to exhaust their administrative remedies before seeking judicial review of that decision. The court indicated that it would conduct the review and would not require a section 388 petition to review the Agency's placement decision.

In December 2010, counsel advised the court that grandfather had moved out of his home so that grandmother could obtain custody of M.L. Counsel stated that grandfather was withdrawing his request for placement, though he would still want custody of M.L. if the exemption were ultimately granted. The Agency, joined by minor's counsel, asked the court to grant the section 387 petition based on grandfather's nonexempt criminal history. The court, finding that grandfather had not been "dragging his feet at all," stated that the exemption process had been handled "extremely poorly." It continued the hearing on the section 387 petition, with the section 366.26 hearing to trail.

### G. Removal of M.L. from First Foster Home

On December 21, 2010, M.L. was removed from the home of her foster mother and moved to the home of a nonrelative extended family member (the godmother of one of her sisters). The reason for the move was the Agency's concern that the foster mother had been fabricating the medical symptoms of another child in her care. In a January 2011 hearing on the move from the first foster home, the court was highly critical of the Agency's delay in notifying the court and minor's counsel of these concerns, which had arisen before the previous status hearing in M.L.'s case.

### H. Further Proceedings on Section 387 Petition

In a hearing held March 1, 2011, minor's counsel advised the court that M.L. was doing well in her placement with the second foster mother. Minor's counsel asked the court to rule on the section 387 petition, indicating that while she did not agree with the Agency's process, removal from the grandparents' home had been the correct result and it was not in M.L.'s best interest to delay the proceedings. The court declined to rule on the section 387 petition, and stated that it would allow additional time for investigation.

Minor's counsel advised the court that if the evidence on the section 387 petition were being reopened, she would want the court to consider whether M.L. had received appropriate development care in the grandparents' home, given that M.L. had later been found eligible for regional center services[6] but had not been evaluated while in the grandparents' care.

The continued hearing on the section 387 petition commenced on April 15, 2011, and continued until August 2011. Representing the Agency, county counsel noted that while the evidence to date had been different than that alleged in the initial petition, the concerns about the grandparents as caretakers were still the same. Counsel submitted a memo proposing that the court amend the section 387 petition to conform to proof by alleging that grandfather had not obtained an exemption for his criminal history and appeared to still live in the home; that grandmother appeared unstable and had panic attacks; and that the grandparents had minimized or denied an incident of domestic violence that occurred in February 2009, while M.L. was living in the home. Minor's counsel agreed that the section 387 petition should be sustained, stating that everyone involved in the case had dropped the ball by initially placing M.L. with her grandparents.

SEED social worker Budnitz testified that grandmother had missed several recent visits with M.L. for health reasons, had given him medical documentation about her congestive heart failure, and had reported having a panic attack. Grandmother had told Budnitz she would like to see M.L. go back to her parents, which concerned him because the parents had unresolved substance abuse issues. Budnitz noted that M.L. had not received regional center services earlier, possibly because the grandparents did not understand her special needs. He did not recommend placement with grandmother due to her health issues, her failure to demonstrate insight into the domestic violence incident of 2009, her limited understanding of M.L.'s developmental needs, and his suspicion that she was still living with grandfather, who had an unexempted criminal history.

Natalia El-Sheikh, M.L.'s SEED therapist, believed that M.L. suffered from an attachment disorder, but was primarily attached to her current foster mother. She thought that if M.L. were moved to the grandparents' home she might lose the ability to form healthy attachments, though El-Sheikh could not say with certainty that a change in placement would have a lasting permanent effect.

Grandfather testified that he was living at a home for veterans, not with grandmother. He had stopped drinking, was working with a psychologist at

---

[6] Regional centers deliver services to individuals with developmental disabilities. (See *In re Michael K.* (2010) 185 Cal.App.4th 1112, 1116, fn. 2 [111 Cal.Rptr.3d 187].)

the Veteran's Administration, and had received counseling from his pastor about the domestic violence incident in 2009.

Finally, the court heard the testimony of Michelle Love, the Agency division director who reviewed grandfather's internal appeal from the denial of the criminal records exemption. She had written to grandfather on December 17, 2010, informing him that the appeal was denied because, "During our meeting, you continued to minimize your substance abuse history. Further, despite having completed a substance abuse program you were unable to discuss the issues/circumstances that previously led you to abuse substances and any present coping methods to avoid a recurrence of the same."

Love explained that she had looked at the totality of the circumstances when reviewing grandfather's record, including the number of convictions and the inclusion of some acts of violence. She also considered that in his initial application for placement, he claimed not to have had any criminal convictions. In Love's opinion, grandfather's written explanation of his criminal history did not show insight, and during their interview, he needed to be prompted by grandmother or his attorney before answering questions. It was difficult for Love to get grandfather to explain the circumstances of his convictions, and he seemed to minimize their seriousness. At this point, grandfather could request a new hearing on the exemption, but could not seek to further appeal the decision with the Agency.

### I. Status Review Hearing—No Reasonable Services to Minor

On June 23, 2011, while the hearing on the section 387 petition was ongoing, the court held a status review hearing and found that the Agency had not provided reasonable services to M.L.

### J. Juvenile Court's Ruling on Second Section 387 Petition

On August 4, 2011, the juvenile court dismissed the section 387 petition and ordered M.L. placed with the grandparents. It found that M.L. was in an existing relative placement with her grandparents when she was moved from their home in March 2010. It stated that the Agency's characterization of the initial placement with the grandparents as an emergency placement was "almost a silly distinction" and that the placement had "practically morphed into a constructive placement." The court did not find it credible that M.L. was at risk in her grandparents' home, as evidenced by the fact that the Agency did not remove her for two months after learning of grandfather's criminal history. It considered the emphasis on the 2009 domestic violence arrest to be "insulting."

The court stated that it did not matter whether grandfather was still living in the home, because he had cooperated in the exemption process and the

Agency had shown "arrogance" in denying the exemption. It found "[T]he whole handling of this case by the Agency was a complete abuse of discretion," and "[T]he exemption request contains nothing that shouldn't have been exempted." The court ordered the Agency to formulate a plan to gradually transition M.L. into the grandparents' home, and to provide reunification services to the extent they were available. Those services were to include providing transportation passes to the grandparents for visits with M.L.

## II. DISCUSSION

A. *M.L. Was Placed with Her Grandparents on an Emergency Basis in December 2009, and Could Not Be Permanently Placed in Their Home Without a Criminal Records Exemption.*

Before a child is formally placed in a relative's home, the social worker must conduct a visit to the home, a criminal records check, and a child abuse index check. (§ 361.4, subds. (a)–(c).) The criminal records check must be performed on all persons over 18 years of age who live in the home, "and on any other person over 18 years of age . . . known to the placing entity who may have significant contact with the child, including any person who has a familial or intimate relationship with any person living in the home." (§ 361.4, subd. (b).) "If the criminal records check indicates that the person has been convicted of a crime that the Director of Social Services may grant an exemption for under Section 1522 of the Health and Safety Code, the child shall not be placed in the home unless a criminal records exemption has been granted by the county, based on substantial and convincing evidence to support a reasonable belief that the person with the criminal conviction is of such good character as to justify the placement and not present a risk of harm to the child pursuant to paragraph (3)." (§ 361.4, subd. (d)(2).)[7]

Grandfather's criminal record includes convictions for crimes for which an exemption is required under section 361.4, i.e., crimes other than minor traffic violations. (*Los Angeles County Dept. of Children & Fam. Services v. Superior Court* (2001) 87 Cal.App.4th 1161, 1166 [105 Cal.Rptr.2d 254] (*Valerie A.*); see Health & Saf. Code, § 1522, subds. (a) & (g)(1).) The grandparents contend that no exemption was required in this case, because the minor had been formally placed in their home before grandfather's criminal history came to light, and section 361.4 applies only when an initial placement is being considered. We disagree.

---

[7] Prior versions of section 361.4 allowed the state Director of Social Services to waive the application of that statute. The current version of section 361.4, and the one in force at all times relevant to this proceeding, allows the county (i.e., the Agency) to issue exemptions. (See *Sencere P., supra,* 126 Cal.App.4th at p. 151, fn. 3.)

The grandparents rely primarily on *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2003) 112 Cal.App.4th 509, 519–520 [5 Cal.Rptr.3d 182] (*Cheryl M.*), in which the social services agency filed a section 387 petition to remove three dependent children from a long-term foster care placement with their aunt after the aunt was convicted of criminal offenses. (112 Cal.App.4th at pp. 513–514.) The agency argued that the children should be detained outside the aunt's home while the petition was pending, because section 361.4 barred their continued placement with a relative who had an unexempted criminal history. (112 Cal.App.4th at p. 514.) The juvenile court denied the request, ruling that section 361.4 did not require the removal of a child in an existing relative placement. (112 Cal.App.4th at pp. 514–515.) The appellate court agreed with this interpretation of section 361.4 and concluded the juvenile court did not abuse its discretion in refusing to detain the children. (112 Cal.App.4th at pp. 520–521.)

Section 361.4 did not require the removal of the children in *Cheryl M.* because they had clearly been placed with their aunt under a permanent plan of long-term foster care. (*Cheryl M., supra,* 112 Cal.App.4th at p. 513.) M.L., by contrast, was temporarily placed in the grandparents' home on an emergency basis after the Agency filed the first section 387 petition to remove her from her parents' custody. (See §§ 361.45, 319, subds. (b), (f)(1) [temporary detention with relatives].) When the court conducted the detention hearing on that first section 387 petition, it did not formally place M.L. with her grandparents, but committed her "to the care, custody and control of the . . . Agency to be placed in a suitable family home or private institution." The court made an identical order on January 13, 2010, when it sustained the allegations of the section 387 petition and removed M.L. from her parents' custody. Although the court also adopted portions of the social worker's report stating that M.L. had been placed with an "approved relative," other information in the reports makes it clear the placement was made on an emergency basis and that the home was still being investigated.

Though M.L. continued to reside with her grandparents in an emergency placement, this was not the same thing as an ordered placement with the grandparents. (See *In re Cynthia C.* (1997) 58 Cal.App.4th 1479, 1490 [69 Cal.Rptr.2d 1] (*Cynthia C.*).) Nor was the emergency placement transformed into a de facto formal placement due to the "mere passage of time." (*Ibid.* [agency could move minor from aunt's home without § 387 petition when minor had been committed to agency's custody without a formal relative placement; "mere passage of time" did not give aunt a right to continuing custody or placement]; contra, *In re Miguel E.* (2004) 120 Cal.App.4th 521, 528, 540–541, 545–546 [15 Cal.Rptr.3d 530] [agency did not have the absolute authority to move a minor who had been formally placed with grandmother].)

█ Under section 361.4, a minor may not be formally placed with a relative until the necessary criminal records check has been performed. Indeed, the failure to perform a criminal records check would render any formal placement with a relative subject to reversal. (*In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1417–1418 [57 Cal.Rptr.3d 863].) Additionally, section 361.45, which provides for emergency placement with a relative, specifically recognizes that a social services agency may withdraw its approval of a relative home for this purpose when it discovers that the relative has a criminal record: "If a relative or nonrelative extended family member, and other adults in the home, as indicated, meets all other conditions for approval, except for the receipt of a the Federal Bureau of Investigation's criminal history information . . . the county welfare department may approve the home and document that approval, if the relative or nonrelative extended family member, and each adult in the home, has signed and submitted a statement that he or she has never been convicted of a crime in the United States, other than a traffic infraction . . . . *If, after the approval has been granted, the department determines that the relative or nonrelative extended family member or other adult in the home has a criminal record, the approval may be terminated.*" (§ 361.45, subd. (c), italics added.)

On December 8, 2009, grandfather signed and submitted a statement under penalty of perjury that he had not been convicted of a criminal offense, but that statement was discovered to be false when the records check was conducted. Section 361.4 prohibited a formal placement in the grandparents' home absent an exemption, and section 361.45, subdivision (c) authorized the Agency to withdraw its approval of the grandparents' home as an emergency placement and move M.L. to a foster home.

B.  *The Juvenile Court Did Not Have the Power to Grant a Criminal Records Exemption and Exceeded Its Powers in Placing M.L. with Her Grandparents on August 4, 2011.*

According to the Agency (joined by minor's appellate counsel), grandfather's criminal history operates as an absolute bar to placement in the grandparents' home, because his application for a criminal records exemption was denied. The Agency argues that in placing M.L. with the grandparents on August 4, 2011, the court effectively granted a criminal records exemption, something it lacked the power to do. We agree.

█ The decision to grant a criminal records exemption is an executive function that lies exclusively with the Agency. (*In re S.W.* (2005) 131 Cal.App.4th 838, 848 [32 Cal.Rptr.3d 192] (*S.W.*); *Sencere P., supra*, 126 Cal.App.4th at p. 152.) By enacting section 361.4, the Legislature has given the Agency "the express authority to veto" a placement with a relative who

has suffered criminal convictions. (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 796–797 [20 Cal.Rptr.3d 336].)

Having given the authority to grant an exemption to the Agency, "it is apparent that the Legislature did not intend to confer such authority on the juvenile court." (*Valerie A., supra*, 87 Cal.App.4th at p. 1167; see also *Sencere P., supra*, 126 Cal.App.4th at p. 152.) Accordingly, the juvenile court may not place a child with a relative who has an unexempted criminal history, even when the court determines that placement would be in the child's best interests: "The general 'best interest of the child' standard cannot supplant the specific prohibition in section 361.4. [Citation.] . . . [S]ection 361.4 represents the Legislature's determination that it would *not* be in the best interest of the dependent child to be placed with a relative with a disqualifying criminal conviction." (*Valerie A.*, at p. 1168.)

Grandmother suggests that the placement order was proper because grandfather was no longer living in the home and she had no criminal history that disqualified her as a relative caregiver. We disagree for two reasons. First, the juvenile court specifically stated that M.L. would be returned to both grandparents and it did not care whether grandfather had moved out of the home or was only pretending to have done so. Second, the criminal records check under section 361.4 must be performed on "any other person over 18 years of age . . . known to the placing entity who may have significant contact with the child, including any person who has a familial or intimate relationship with any person living in the home." (§ 361.4, subd. (b).)

■ By placing M.L. with her grandparents at the conclusion of the section 387 hearing, the juvenile court effectively granted grandfather an exemption after the Agency had declined to do so. In so doing, it exceeded the scope of its powers. (*Sencere P., supra*, 126 Cal.App.4th at p. 151; *S.W., supra*, 131 Cal.App.4th at p. 849; *Valerie A., supra*, 87 Cal.App.4th at pp. 1167–1168.)

### C. *The Juvenile Court's Determination That the Agency Abused Its Discretion in Denying an Exemption Does Not Authorize Placement with the Grandparents.*

During the hearing on the section 387 petition, the juvenile court heard evidence about the exemption process, including testimony by the Agency representative who heard grandfather's internal appeal. At the conclusion of the hearing, the court stated that the exemption should have been granted by the Agency and that the Agency's handling of the case had been an abuse of discretion. The grandparents argue that placement in their home was appropriate notwithstanding section 361.4 because the court determined that the exemption process itself was unfair. We disagree.

The Agency's decision to deny a criminal records exemption is an executive one subject to administrative review. (*S.W., supra*, 131 Cal.App.4th at p. 848.) The scope of this administrative review includes a hearing before an administrative law judge if timely requested. (*Ibid.*; see also Health & Saf. Code, §§ 1522, 1526, 1551; Gov. Code, § 11502, subd. (a).) The grandparents argue that an applicant whose exemption request has been denied may file a petition for administrative mandamus after exhausting the available administrative remedies. (Code Civ. Proc., § 1094.5; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1058 [81 Cal.Rptr.3d 556] (*Esperanza C.*).) They acknowledge that no such petition was filed in this case, but argue that the Agency's denial of the exemption was an issue properly before the court.

In *Esperanza C., supra*, 165 Cal.App.4th at pages 1058–1059, the court recognized that a juvenile court may review an agency's ruling on an exemption request as part of the dependency proceeding itself, even if no separate writ petition proceeding has been filed. "Considering the juvenile court's role as *parens patriae*, the clear legislative preference for and the child's interest in relative placement, the urgency of dependency timelines, the lack of a timely, effective remedy for a dependent child and his or her parent through existing administrative regulations and procedures, we hold that the juvenile court may review the agency's denial of a criminal records exemption for abuse of discretion." (*Id.* at p. 1060.)[8]

This does not mean that the juvenile court may substitute its own independent judgment on the exemption for that of the Agency. (*Esperanza C., supra*, 165 Cal.App.4th at p. 1059.) If the court determines that the Agency did abuse its discretion, it may direct it to reconsider the request using the appropriate legal standard, but cannot directly override the request and grant the exemption. (*Id.* at pp. 1049–1050.) The juvenile court's finding in this case that the Agency had abused its discretion did not give it the authority to grant grandfather's exemption request or place M.L. in the grandparents' home.

Moreover, the record in this case does not support a finding that the Agency abused its discretion, and the juvenile court's comments show that it misapplied the abuse of discretion standard. (See *Mark T. v. Jamie R.* (2011)

---

[8] In *Esperanza C.*, the challenge to the exemption process was raised in the dependency proceeding via a petition for modification under section 388. (*Esperanza C., supra*, 165 Cal.App.4th at pp. 1049, 1051.) In this case, the juvenile court specifically stated that it would not require a petition under section 388. As no party has challenged the procedural vehicle for presenting the exemption issue, we assume, without deciding, that it was properly considered as a defense of sorts to the Agency's petition under section 387.

194 Cal.App.4th 1115, 1127 [124 Cal.Rptr.3d 200].) A review for abuse of discretion must be highly deferential to the decision maker (here, the Agency), and requires a showing that the decision was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377 [14 Cal.Rptr.3d 880, 92 P.3d 369]; see also *Esperanza C., supra,* 165 Cal.App.4th at p. 1059.) Under the abuse of discretion standard, " ' "When two or more inferences can reasonably be deduced from the facts, the [juvenile] court has no authority to substitute its decision for that of the [Agency]." [Citations.]' " (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505 [26 Cal.Rptr.3d 487].)

■  In considering grandfather's request for a criminal records exemption, the Agency was required to "consider factors including, but not limited to, the following as evidence of good character and rehabilitation: the nature of the crime and whether it involved violence or a threat of violence to others; the period of time since the crime was committed and the number of offenses; circumstances surrounding the commission of the crime that would demonstrate the unlikelihood of repetition; activities since conviction, including employment, therapy or education; a full and unconditional pardon or certificate of rehabilitation; character references; and honesty and truthfulness in the exemption application process." (*Esperanza C., supra,* 165 Cal.App.4th at p. 1056.) While some of these factors arguably weighed in favor of an exemption (the age of several convictions; the granting of certificates of rehabilitation as to some of them), others did not, including the number of convictions and grandfather's submission of a form stating he had no criminal history. And, while the juvenile court minimized the significance of grandfather's arrest for domestic violence in 2009 (a period when M.L. was residing in their home, in her parents' custody), we cannot say that no reasonable decision maker would have considered this an important factor weighing against an exemption. The juvenile court did not properly apply the abuse of discretion standard to the Agency's denial of the exemption; rather, it substituted its own judgment that the exemption should have been granted.

D.  *Although a Section 387 Petition May Have Been Unnecessary to Move M.L. from the Grandparents' Home, Under the Circumstances of the Case, the Juvenile Court Should Have Granted the Agency's Motion to Amend to Conform to Proof and Granted the Petition.*

The Agency argues that in light of grandfather's unexempted criminal record, the trial court abused its discretion in dismissing the section 387 petition that sought to move M.L. from her grandparents' home. It alternatively takes the position (first asserted by minor's counsel) that because M.L.

had not been formally placed with her grandparents, no section 387 petition was required to move her from that home.

■ The argument that no section 387 petition was necessary to move M.L. finds support in *Cynthia C., supra*, 58 Cal.App.4th at pages 1489–1490, in which the court held that no such petition was required to move a child from a relative's home when there had been no formal placement order. "Section 387 states, 'An order *changing or modifying a previous order* by removing a minor from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home . . . shall be made only after noticed hearing upon a supplemental petition.' (Italics added.) Subdivision [(b)] of the statute directs the agency to set forth 'a concise statement of facts sufficient to support the conclusion that the *previous disposition* has not been effective in the . . . protection of the minor.' (Italics added.) The statute unambiguously governs situations involving an *ordered* placement which the agency later considers ineffective." (*Cynthia C.*, at p. 1489.)

As we have previously discussed, M.L. was never formally placed with the grandparents. Accordingly, the Agency "was *always* authorized to exercise its discretion to reassess the suitability of the environment in which it had placed [M.L.] and, if deemed unsuitable, move [her] to an improved situation." (*Cynthia C., supra*, 58 Cal.App.4th at p. 1490.) Viewing this case as one in which no section 387 petition was necessary, we would affirm the order dismissing the petition (albeit on different grounds than that asserted by the juvenile court), but reverse the order placing M.L. with her grandparents.

■ That said, the Agency elected to proceed via section 387, and we cannot ignore that M.L.'s placement remained in a state of uncertainty while the hearing on that petition was held over a period of 17 months. There is a "time-honored rule that where the parties and the court proceed throughout the trial upon the theory that a certain issue is presented for adjudication, the doctrine of estoppel precludes [any] party from thereafter asserting that no such issue was in controversy . . . ." (*Auer v. Frank* (1964) 227 Cal.App.2d 396, 405 [38 Cal.Rptr. 684].) Given its pursuit of an order on the section 387 petition, we deem the Agency estopped from claiming that no such petition was required.

Whether the section 387 petition was unnecessary, or whether it was properly filed to obtain court approval of the new foster care placement, the end result—reversal of the order placing M.L. with her grandparents—is the

same. The amended section 387 petition filed by the Agency on April 22, 2010, which was the operative pleading in this case, alleged in relevant part that grandfather "had not cooperated with all the steps necessary to comply with the exemptions process." In light of the evidence produced at trial, the Agency asked the court to amend the petition to conform to proof and sustain it based on a finding that, among other things, grandfather had failed to obtain a criminal history exemption. Grandfather's failure to obtain the exemption was uncontested and rendered the grandparents' home ineligible as a relative placement. The juvenile court abused its discretion in dismissing the petition as insufficient rather than ordering it amended to conform to proof and sustaining it on its merits. (See *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041–1042 [113 Cal.Rptr.2d 597].)

E. *The Reversal of the Order Placing M.L. with the Grandparents Makes Reunification Services and Transportation Assistance for the Transition Unnecessary.*

The Agency argues that the juvenile court erred by ordering it to provide reunification services and transportation assistance to facilitate M.L.'s transition back into the grandparent's home. As we are reversing the placement order under which that transition would have been made, the order requiring services and transportation assistance must be reversed as well. It is unnecessary to consider Agency's claim that the order was unauthorized in the first instance.

F. *Issues pertaining to June 23, 2011 Status Review Hearing*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III.  DISPOSITION

The August 4, 2011 juvenile court order dismissing the Agency's section 387 petition and placing M.L. with the grandparents is reversed. The case is remanded and the juvenile court is directed to (1) enter a new order amending the Agency's section 387 petition to allege, "Grandfather has criminal convictions under Welfare and Institutions Code section 361.4 and has not obtained an exemption for those convictions," (2) sustain the petition as amended; and (3) order that M.L. be committed to the care, custody, and control of the Agency to be placed in a suitable placement outside the gransparent's home. The August 4, 2011 order requiring the Agency to

---

[*]See footnote, *ante,* page 210.

provide reunification services and transportation assistance to the grandparents is reversed. The order made at the June 23, 2010 status review hearing is affirmed. This court's writ of supersedeas, issued February 23, 2012, shall be dissolved upon the issuance of the remittitur.

Jones, P. J., and Simons, J., concurred.

Petitions for a rehearing were denied May 16, 2012, and the opinion was modified to read as printed above.