Filed 7/24/24  In re I.A. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.A., a Person Coming Under the Juvenile Court Law. | B333428 (Los Angeles County Super. Ct. No. 20CCJP01598A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. HUGO A., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Senior Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Hugo A. (father) appeals the juvenile court's order terminating his parental rights over his six-year-old daughter I.A.  Because the evidence does not compel application of the beneficial parent-child relationship exception to the termination of parental rights, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Exertion of Dependency Jurisdiction

#### A. *Family*

Father and D.O. (mother) are the parents of I.A., who was born in November 2017.

#### B. *Conduct giving rise to jurisdiction*

Father engaged in domestic violence.  He regularly argued with mother, and those arguments would erupt into physical violence.  This violence endangered I.A.:  Father slammed mother into a wall while she was pregnant with I.A. and, after I.A.'s birth, on more than one occasion, slapped mother's face or punched her in the upper body with I.A. nearby.

Father also used drugs. In 2020, he used marijuana daily and methamphetamine weekly. At first, father freely admitted his marijuana use, but denied his use of methamphetamine.

### C. *Initial assertion of dependency jurisdiction*

The Los Angeles County Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over I.A. due to father's domestic violence and substance abuse, which placed I.A. at substantial risk of serious physical harm and rendered jurisdiction appropriate under Welfare and Institutions Code section 300, subdivisions (a) and (b).[1]

On March 20, 2020, I.A. was detained from the parents, and placed with maternal great-grandmother.

At a June 24, 2020 hearing, the juvenile court sustained the allegations against father, removed I.A. from her parents' custody, and continued her placement with the maternal great-grandmother.

From June 2020 through June 2021, father did not visit I.A. despite being granted monitored visits three times a week, claiming that he was "out of town."

### D. *Second assertion of dependency jurisdiction*

Although father was aware of the initial jurisdictional and dispositional hearing and elected not to attend, father on August 3, 2021 filed a request for the court to convene a new hearing because the notice he received did not contain the specific apartment number of the complex where he lived. The court

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

3

granted the request, and held a second hearing on December 10, 2021.

At the second jurisdictional and dispositional hearing, the court once again sustained the allegations, ordered I.A. removed from her parents, and ordered reunification services with the same case plan for father as before—namely, (1) a 52-week domestic violence course, (2) a full drug and alcohol program, with aftercare and weekly testing, (3) a parenting class, and (4) individual counseling to address case issues. The court granted father monitored visitation three times a week, for three hours per visit, and permitted virtual visits if in-person visits could not be scheduled.

## II. Reunification Period

The juvenile court granted father 18 months of reunification services following the second hearing; this reunification period ran from December 2021 to June 2023.

During this period, father completed the parenting classes, but did not complete the domestic violence course, was dropped from a drug treatment program, and never enrolled in individual counseling. He continued to test positive for marijuana, but denied any drug use. In April 2023, father tested positive for methamphetamine, but specifically denied methamphetamine use.

I.A. remained with the maternal great-grandmother, and they developed a close, positive bond. I.A. thrived.

Father visited I.A. once a week during the first six months of reunification, and the visits were positive. During the second six months, father visited I.A. twice a week for 90 minutes per visit. The Department repeatedly offered to alter the visitation days and times to accommodate father's work schedule, but

4

father declined. During the third six-month period, father would often visit I.A. twice a week for 90 minutes per visit, but canceled 10 of those visits. During her visits with father, I.A. was excited, and father and I.A. had a "good" relationship and a "positive" and affectionate "bond." I.A. was not upset at the end of father's visits.

On June 20, 2023, the juvenile court terminated father's reunification services after finding that he had made only "partially substantial" progress.

### III. Termination of Parental Rights

From June 2023 through late August 2023, father's visits became more sporadic and he began arriving late for them. I.A. reached out to father on Facebook, but he ignored her missives. Father only visited I.A. on two occasions after June 2023, and his visits stopped altogether after August 27, 2023.

On November 8, 2023, the juvenile court held a permanency planning hearing. Father asked that his parental rights not be terminated under the beneficial parent-child relationship exception. The juvenile court terminated father's rights, finding the exception did not apply because (1) father did not "maintain consistent visitation" with I.A., (2) father did not "establish" that he had a "strong emotional bond" with I.A. because he was "more akin to a friendly . . . uncle," and (3) termination of father's parental rights would accordingly not be "detrimental" to I.A.

### IV. Appeal

Father filed this timely appeal.

### DISCUSSION

Father argues that the juvenile court erred in not applying the beneficial parent-child relationship exception.

5

## I.  Pertinent Law

Once a juvenile court has terminated reunification services, the court "shall terminate parental rights" if it finds, "'by clear and convincing evidence[,] that it is likely that the [child] will be adopted'" within a reasonable time.  (§ 366.26, subd. (c)(1); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.)  Thus, a juvenile court must terminate parental rights and order adoption unless the parent opposing termination proves that one of six statutory exceptions applies.  (§ 366.26, subds. (c)(1) & (c)(1)(B); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, overruled in part on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

The exception at issue here is the beneficial parent-child relationship exception.  Because the exception "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child," a court will find the exception applicable only if the parent "establish[es]" "(1) regular *visitation and contact*, and (2) a *relationship,* the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

In assessing whether a child would benefit from a continued relationship with the parent (the second element), the parent must show "that the child has a substantial, positive, emotional attachment to the parent," where a "significant attachment" means the parent shows "'attention to the child's needs for physical care, nourishment, comfort, affection and stimulation,'" a "positive attachment" means one that is

"nurturing and provides the child with a sense of security and stability," and an "emotional attachment" means "the child views the parent as more than a mere friend or playmate and who[se] interactions with the parent were not ambivalent, detached, or indifferent." (*Caden C.*, *supra*, 11 Cal.5th at p. 636; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.) Several factors are relevant when examining the attachment; they include (1) "'[t]he age of the child, [(2)] the portion of the child's life spent in the parent's custody, [(3)] the "positive" or "negative" effect of interaction between parent and child, and [(4)] the child's particular needs.'" (*Caden C.*, at p. 632.)

In assessing whether the termination of parental rights would be detrimental to the child "when balanced against the countervailing benefit of a new, adoptive home" (the third element), a court is to examine "how the child would be affected by losing the parental relationship" entirely. (*Caden C.*, *supra*, 11 Cal.5th at pp. 634, 636.) This is necessarily a "subtle, case-specific inquiry." (*Id.* at p. 633.)

We review a juvenile court's findings regarding the first two elements (visitation and relationship) for substantial evidence, and its ruling regarding the third element (balancing of detriment versus benefit) for an abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) Because the parent challenging the termination of parental rights bears the burden of establishing the exception, the parent (here, father) can prevail on appeal only if (1) the evidence in the record *compels* a finding in the parent's favor as a matter of law as to the first two elements of the exception (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1227; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 967); and

7

(2) the juvenile court's conclusion that the termination of the parent's rights would not be detrimental to the child was irrational and arbitrary (*In re M.L.* (2012) 205 Cal.App.4th 210, 227-228).  This is a notoriously heavy burden to sustain.

## II.    Analysis

The juvenile court did not err in declining to apply the beneficial parent-child relationship exception.

The evidence does not compel a finding that father had regular visitation and contact with I.A.  The consistency of visitation is measured against "'the extent permitted by [the juvenile] court['s] orders.'"  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  Here, father visited I.A. twice a week for 90 minutes (approximately three hours a week) during the 18-month reunification period, although he canceled nearly a dozen visits in the last few months of this period.  While regular, this was only one-third of the nine hours of weekly visits permitted by the court's orders, and father could have but did not utilize virtual visits.  In the months after the juvenile court terminated father's reunification services, his visits became more sporadic and nearly stopped altogether.  This record does not compel a finding of regular visitation and contact.  Father responds that his failure to use the full nine hours a week was due to his work schedule, but ignores the evidence that the Department repeatedly offered to accommodate that schedule and that father repeatedly declined to do so.

The evidence also does not compel a finding that I.A. had a "substantial, positive, emotional attachment" to father.  Although father demonstrated that I.A. had bonded with him, that bond does not by itself translate into the existence of a "substantial, positive, emotional attachment" that otherwise "suffices to

8

establish the exception overall." (*In re J.D.* (2021) 70 Cal.App.5th 833, 857, fn. 17; *In re M.V.* (2023) 87 Cal.App.5th 1155, 1185 ["the second element is not, 'Is there a bond?'"].)  Nor does the evidence compel a finding of this greater level of attachment. The twice-weekly, 90-minute monitored visits father had with I.A. did not give father the opportunity to provide I.A. with a sense of stability and security or to develop a relationship that was more than that of a "friendly uncle"; what is more, father demonstrated his "indifference" toward I.A. by ignoring her Facebook messages after he ceased his visits in the fall of 2023. An analysis of the pertinent factors leads to the same conclusion: Although I.A.'s interactions with father were positive, I.A. had still spent more than half of her young life (from age two to age six) outside of father's custody, and father's continued struggles with substance abuse (and his failure to acknowledge those struggles) constitute a "negative effect" on I.A. (*Caden C.*, *supra*, 11 Cal.5th at p. 637).  Father responds that he was more than a friendly visitor, but the record does not show the juvenile court's characterization of father's relationship as that of a "friendly uncle" to be incorrect.  Father further responds that he need not play a parental role for the requisite attachment to exist.  That is true, but ignores that the absence of such a parental role is relevant to show the absence of a significant attachment.  (E.g., *In re Katherine J.* (2022) 75 Cal.App.5th 303, 319-320; *In re A.L.* (2022) 73 Cal.App.5th 1131, 1155.)

The juvenile court did not act irrationally in determining that terminating father's parental rights would not be detrimental to I.A. "when balanced against the countervailing benefit of a new, adoptive home."  Given the absence of a strong attachment between I.A. and father, the absence of any negative

9

reactions at the end of I.A.'s visits with father, and the strong bond I.A. has with the maternal great-grandmother, the court did not act irrationally in concluding that terminating father's parental rights would not have a detrimental effect on I.A. Father responds that it is inappropriate to compare the relative bond between I.A. and father on the one hand, and I.A. and the maternal great-grandmother on the other. Although father is correct that it is not appropriate to compare whether a parent or the current caregiver would be a better caregiver (because the child will not be placed back in the parent's custody) (*Caden C.*, *supra*, 11 Cal.5th at p. 634), the extent of the child's *bond* with the parent and the caregiver is relevant to the second and third elements (*ibid.*). In his reply brief, father also represents that the social worker "acknowledged that severing the relationship would have a negative impact on [I.A.'s] emotional state"; father's representation is misleading because the social worker actually reported that severance "would have *some* negative impact" because it would result in the "los[s] of visits," but that the termination of parental rights would not cause I.A. any detriment "in terms of losing any significant emotional attachment." (Italics added.) When properly viewed in context, this passage is not the silver bullet father suggests it is and does not call into question the juvenile court's exercise of discretion.

10

## DISPOSITION

The order terminating father's parental rights is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

LUI


_____, J.

CHAVEZ