Filed 10/15/13  In re E.P. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| In re E.P., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, | Consolidated Case Nos. F066571 & F066668 |
| Plaintiff and Respondent, | (Super. Ct. Nos. JD127882-00 & JD127883-00) |
| v. | |
| C.H., | **OPINION** |
| Defendant and Appellant. | |
| In re E.H., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| E.H., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Kern County.  Louie L. Vega, Judge.

Elaine Forrester, under appointment by the Court of Appeal, for Defendant and Appellant, C.H.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant, E.H.

Theresa A. Goldner, County Counsel, Paul E. Blackhurst, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

In these consolidated appeals, C.H. (mother) and E.H. (father) appeal from the juvenile court's order terminating their parental rights to their daughter, E.H.  (Welf. & Inst. Code, § 366.26.)[1]  Mother also appeals from the order terminating her parental rights to her daughter, E.P.  Father contends the juvenile court abused its discretion when it failed to recognize and correct the Kern County Department of Human Services' (DHS) inadequate assessment of relatives who had requested placement.  Mother joins father's argument.

We disagree and affirm the juvenile court's order terminating parental rights.

### *FACTUAL AND PROCEDURAL HISTORIES*

Mother and father are the parents of E.H.  Mother has another daughter E.P.  E.P.'s alleged father is not part of this appeal.

In December 2011, E.H. was born at 30 weeks gestation.  At the hospital, she and mother tested positive for amphetamine and methamphetamine.  Mother reported that she began using methamphetamine during her sixth month of pregnancy and used the drug

---

[*]Before Cornell, Acting P.J., Gomes, J., and Peña, J.

[1]Subsequent statutory references are to the Welfare and Institutions Code.

two days before the birth. E.H. and E.P. were placed in protective custody. E.H. remained in the hospital; she was being fed through a tube and had respiratory distress.

On December 19, 2011, the DHS filed juvenile dependency petitions on behalf of E.P. and E.H. alleging they were at substantial risk of harm because of mother's substance abuse. (§ 300, subd. (b).) It was alleged that, in addition to E.H. testing positive for drugs when she was born, when E.P. was born in 2010, mother and E.P. tested positive for amphetamines.[2]

At a hearing on December 20, 2011, mother submitted on the issue of detention. Mother reported that she had delivered her parents' (maternal grandparents) application for relative placement, and her attorney asked the DHS to expedite the matter. Father requested that E.H. be released to him when she was ready to leave the hospital. Father's attorney told the court that, although father and mother were currently living together, mother would vacate the residence in order to have E.H. placed with father. Father would also submit to drug testing if necessary.

The juvenile court ordered E.P. and E.H. detained from mother and authorized the DHS to place E.H. with father if found appropriate.

A jurisdictional hearing scheduled for February 14, 2012, was continued because E.P.'s alleged father was in custody and had not been transported to court. Before the hearing was continued, however, the attorney representing the children raised a concern about the maternal grandparents' relative-placement application. She told the court: "[W]e seem to have a lot of difficulty with the Relative Assessment Unit. They are very, very low right now.… [T]here's a relative that's made application for placement, and we still don't have a result. I don't know what's going on." In response, a social worker said that she had checked with relative placement and they had not received Live Scans

_____

[2]The DHS began a voluntary family maintenance case for mother as a result of E.P.'s positive drug test. Mother was noncompliant throughout the case, and the DHS closed the case in March 2011 because mother could not be located.

or health forms from the grandparents or other adults living in the home.[3] She explained, "So until they receive those, they can't be assigned to a worker."

Father's attorney stated that the paternal grandmother had also applied for a relative placement. The social worker reported that if such an application had been made, it was "not in our system …." The court stated, "So either reapply or make sure who's on the case so they can follow up on it." The court discussed transporting E.P.'s alleged father to the next hearing and then returned to the relative-placement issue. The court appeared to direct the DHS to follow up on the relative-placement applications, stating, "And we'll get the applications for placement from the maternal and paternal grandparents processed in the meantime."

On March 22, 2012, the juvenile court held a hearing on jurisdiction and disposition. Mother submitted to the petition, and the court found the allegations of the petition true. Father requested placement and family maintenance services. His attorney asserted that father was a nonoffending parent and his drug tests were negative; he argued there was no basis for removing E.H. from his custody. The children's attorney disagreed, noting that mother and father were currently living together and had been living together when mother was using methamphetamine while she was pregnant with E.H. The DHS recommended that mother and father receive family reunification services. The court agreed that reunification services were appropriate for mother and father and denied father's request for placement with family maintenance services. Father and mother were ordered to participate in counseling for child neglect and parenting. Mother was ordered to participate in counseling for substance abuse, and both parents were ordered to submit to random drug testing on at least a monthly basis.

---

[3]"Live Scan" refers to an electronic fingerprinting system used to check an individual's criminal background. (*In re M.L.* (2012) 205 Cal.App.4th 210, 215, fn. 3; see Health & Saf. Code, § 1522.04.) Whenever a child may be placed in the home of a relative, all persons over 18 years of age living in the home are subject to a criminal records check. (§ 361.4, subd. (b).)

During the hearing, father's attorney voiced his concern that the children had been in foster care for three months, and even though relatives on both mother's and father's sides had applied for placement, no action had been taken on the applications as far as father knew. The social worker responded that an application from the maternal grandparents, L.H. and J.H., had been received, but no case worker had been assigned. She said: "[W]hen the department hasn't received fingerprints or medical clearances for the people living in the home, there's not a worker assigned. So, at this point, I would assume that one or both have not been received." She did not mention the paternal grandmother. The juvenile court observed that the applicants were the cause of the delay, "[s]o they need whoever's going to be applying to follow up on what they need to do."

Father's attorney said he was concerned about whether the applicants knew what the process was, and the social worker responded that she had personally spoken to the maternal grandparents and notified them of the procedures. The court stated that the burden was on the applicants to move forward. Father told the court that his parents were supposed to have received a booklet or pamphlet explaining the process and they had not received one. The social worker described the application process—after an application is turned in, the DHS sends out a packet explaining the information required, including Live Scan. When the packet is completed, a social worker is assigned to investigate the home for relative placement. The children's attorney requested a packet so she could help relatives with questions about completing it. Father's attorney stated for the record that father's parents had turned in an application over a month-and-a-half before the hearing but had not received a packet. The court stated: "Let's follow up on that today, then, see where we are. We need to get this moving so we can get the kids with the family members and keep that connection going and strengthen it."

The court also mentioned that, in an unrelated matter, it held "an OSC with the placement director or supervisor and was advised of the process." The court was

"satisfied that once the preliminary criteria [have] been met as far as procedurally that this matter will go forward."

Following the hearing, the DHS prepared a memorandum to the court dated March 23, 2012, with copies to all the parties' attorneys. The memo's author, social worker Jenne Boado, wrote that she met with mother and father after the hearing. Father told her that he and mother lived with his mother, O.S. Boado also spoke with the office services supervisor at the relative assessment unit (RAU), who reported there was no application on file for the paternal grandmother. In addition, Boado spoke to another RAU worker, who stated that the RAU had not received an application from O.S. The RAU worker also mentioned the home would not be considered for placement until the parents no longer reside there. On March 23, 2012, a relative assessment application was mailed to O.S.

Boado also reported on the application from the maternal grandparents, L.H. and J.H. They were sent a letter on January 9, 2012, which informed them that every adult residing in the home was required to return a completed Live Scan, a criminal record statement, and a health screening report. On March 1, 2012, L.H. had fingerprints taken for Live Scan, but the prints were rejected two days later. On March 8, 2012, a social worker called L.H. and J.H. and spoke to J.H. as L.H. was not home. The social worker told J.H. that L.H.'s fingerprints had been rejected and she needed to submit fingerprints again for Live Scan. J.H. said that L.H. would call if she had any questions. As of the date of the memorandum, L.H. had not contacted the RAU about retaking fingerprints for Live Scan.

The next juvenile court hearing was for the six-month review. The DHS gave notice that its recommendation was to terminate reunification services for mother and father. The DHS prepared a social study for the hearing, which the court received on September 14, 2012. It reported that mother and father had made no progress toward

6.

alleviating or mitigating the cause for the children's removal from the home and had not availed themselves of the services provided.

Mother enrolled in counseling for parenting/neglect on August 20, 2012. She attended the first session, missed the next two, and was dropped from the class on August 29, 2012. Mother enrolled in substance abuse counseling on March 7, 2012, but her substance abuse counselor reported that mother would be unsuccessfully discharged from the program. Mother had a positive drug test for amphetamines and methamphetamines on June 21, 2012; a positive test for amphetamines on August 28, 2012, was awaiting confirmation. She also declined to test on one occasion, resulting in a "[p]resumptive positive."

The DHS reported that father had been arrested on April 22, 2012, for violation of parole.[4] He was sentenced to 130 days and released on May 15, 2012.

In a meeting with a social worker on August 21, 2012, father would not sign his case plan. Father said he felt as though the system was setting him and mother up to fail. He said he had to work to pay for an attorney, but if he works he is unable to attend visits. He said he missed visits because he had a flat tire once and his work schedule changes. The social worker asked if he did drug tests, and father responded that he did not know why the DHS does not use the drug test results from his parole officer. Father also stated that he wanted the girls placed with either his mother or the maternal grandmother. He said the grandmothers were denied placement and were never told why they had been denied. Father refused to submit to drug tests for the DHS.

---

[4]The social study does not discuss the conditions of father's parole or identify the crime(s) for which he was serving parole. Father's criminal history was provided to the juvenile court, however, and includes convictions for possession of a controlled substance for sale in 1994, possession of a firearm by a felon in 2000, and possession of controlled substance, forgery, and assault with a firearm on his person in 2004.

Supervised visits with the children were reported to be of good quality. The parents, however, did not always attend their visits. Over the course of seven months, mother had missed five scheduled visits and father had missed four.

In a supplemental social study, it was reported that father's parole officer conducted random drug tests on a monthly basis and father's tests had been negative. A social worker met with father and mother on September 18, 2012. Again, father would not sign his case plan. He said it was not fair that he was being punished for mother's actions.

At the six-month reviewing hearing on September 24, 2012, the juvenile court found that mother and father had not made acceptable efforts and had not availed themselves of the services provided to facilitate the return of the children. Since the children were under age three at the time they were initially removed from the parents, and there was not a substantial probability the children might be returned within six months, the court ordered family reunification services terminated for mother and father.

Mother and father did not attend the hearing. Father's attorney objected to setting a section 366.26 hearing. He explained that father was "not participating as a matter of principle" because his position was that he did not cause the situation that brought about the children's removal. A permanency planning hearing was scheduled for January 22, 2013.

The DHS prepared a social study for the section 366.26 hearing, which the court received on January 9, 2013. It recommended that mother and father's parental rights be terminated and E.P. and E.H. be freed for adoption. E.P. initially was placed in an emergency foster home on December 15, 2011. She was placed in a second foster home on December 22, 2011. She was placed in a third foster home on November 1, 2012. E.H. was initially placed in a foster home on January 20, 2012, and was placed in a second foster home with E.P. on November 1, 2012. On December 13, 2012, the caretakers informed the DHS that they did not wish to pursue adoption because they were

8.

overwhelmed. The current plan was to place E.P. and E.H. together in a preadoptive foster home on January 10, 2013, and the adoptive parents had completed an approved adoption home study.

The DHS reported that a second application for placement from the maternal grandparents was received on December 10, 2012. According to the social study, the first application had been withdrawn because the applicants were unable to obtain approval from their landlord to add two additional tenants. On December 14, 2012, an RAU social worker contacted the maternal grandparents, informing them that the RAU required a letter from their landlord granting permission for 11 people to reside in the home. No such letter was received by December 21, 2012, and the application was withdrawn.[5]

At the scheduled section 366.26 hearing on January 22, 2013, mother and father again raised the issue that the maternal grandparents had been seeking placement of the children since the beginning of the case. Father's attorney called the maternal grandfather, J.H., as a witness.

J.H. testified that he requested placement of E.P. and E.H. He was never told that he or his wife had not qualified for placement. He never told the DHS he was no longer interested in having the children placed in their home. J.H. was asked if there was an issue about the number of people living in the house. He responded, "Yes. The owner of the apartments only wants a certain number of people in that apartment." He said he was making arrangements to get a larger apartment. At the time he rented the apartment, J.H. was told by the owner that the limit was eight people. J.H. hoped to get a larger

---

[5]The social study described the maternal grandparents' applications as "withdrawn," suggesting the applicants actively withdrew their application from consideration. In context, however, it is clear that the DHS meant that the applications were deemed to have been withdrawn based on the applicants' failure to provide documentation that their landlord would allow them to take in the children.

apartment as soon as possible, and he estimated it would be two months. There were currently eight people living in his apartment.

On cross-examination by the children's attorney, J.H. testified that he never had contact with any social workers. His wife spoke with them. They had lived in their current apartment for almost two years. They had not moved to a larger apartment because they did not think "it was that much an emergency or urgent yet." He had not requested visits with the girls since they were detained in December 2011.

Father's attorney also called the maternal grandmother, L.H. She testified that she applied for placement of E.P. and E.H. She never withdrew her application. She did not know why the children were not placed in their home. Regarding the occupancy limit at their current apartment, she testified: "When we first rented the place, we told them—the situation to the landlord, that we wanted to get the children, and he wrote down 11 people on the paper. Now he changed because he hired another person, a manager. And he says that now he's going by the book. He's going by the book now. And that's the reason why he's changing it now."

L.H. testified that when they rented their current apartment, their intention was to take E.P. and E.H. Asked whether the landlord had approved 11 residents, L.H. responded that he said he was going to think about it. They already have two grandchildren who were placed with them by the DHS. She said they applied for placement in November 2012 and received a letter from the DHS requesting written permission from the landlord to allow additional residents. They showed the DHS letter to the landlord but he did not make any effort to look at it. L.H. told the DHS that the landlord would not approve additional residents, and she was told it was already too late and she would have to go to court.

L.H. made another application for placement and again was told she needed written permission from the landlord that two more children could live in the apartment. The new manager would not give approval. L.H. said there was a house they intended to

rent, but they were waiting for it to be fixed up.  She was not sure how long they had been waiting for the house to be fixed up, but it was not very long.  She had visited E.P. and E.H. twice since they were detained in 2011.

L.H. first applied for placement in January 2012.  She had to have her fingerprints taken three or four times.

Mother's attorney requested a continuance of the section 366.26 hearing to allow the DHS to complete the relative-placement application process.  He argued the law requires the DHS to inquire about relative placement whenever there is a change of placement as long as the relative has not been disapproved in the past.  Here, the maternal grandparents were never disapproved, and there was recently a change in placement.  The initial application had been with the DHS for over a year without completion.  He argued, "[I]n light of the failure of the department to proceed according to the law in that respect … I believe it would be incumbent upon this court to continue this matter until that is accomplished .…"

The children's attorney disagreed.  She pointed out that the DHS did contact L.H. and that was why she made a new application in November or December 2012.  The maternal grandparents had almost a year to figure out their housing problem and "obviously haven't taken it very seriously towards moving to a place where they can take in their grandchildren."

The attorney for the DHS stated, "I think we just did a review," arguing that J.H.'s and L.H.'s testimony established that they were not in a position to receive the children in their home.

The juvenile court denied the request for a continuance.  The court explained:

> "The court did consider the issue as to the—proceeding with the hearing and the effect it would have on placement of the children.  The testimony pretty much speaks for itself, that the grandparents have not visited with the children.  They do not have a home that is acceptable by their own contractual relations with their landlord, notwithstanding what testimony was presented in that regard, that is, a contractual relationship

11.

between the landlord and the tenants. And the landlord has told the tenants what the terms are that he or she is going to enforce. And so this court is not going to get involved in that relationship other than to acknowledge that precludes them under the circumstances presented here this morning."

The court also observed that the Live Scan issue was "not a material factor … as to having an appropriate home."

The juvenile court then proceeded to permanency planning. It found the children adoptable and ordered the parental rights of mother and father terminated.

Mother filed a notice of appeal on January 24, 2013. Father filed a notice of appeal on February 13, 2013.

### *DISCUSSION*

Father and mother contend that the juvenile court abused its discretion when it failed to recognize and correct the DHS's inadequate assessment of the relatives who had requested placement.

As a preliminary matter, DHS asserts the parents lack standing to raise the issue because they were not injured by the juvenile court's decision. (*In re K.C.* (2011) 52 Cal.4th 231, 236.) Father responds that, absent the DHS's dereliction of its mandatory duties, it is possible the children would have been placed with the maternal grandparents, and he may have had a vehicle with which to challenge the order terminating his parental rights. (See *In re H.G.* (2006) 146 Cal.App.4th 1, 9-10; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1053-1054.) We assume, without deciding, the parents have standing and conclude their contention nonetheless fails.

Section 361.3, subdivision (a), provides that, "[i]n any case in which a child is removed from the physical custody of his or her parents …, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative .…" This "means that the relative seeking placement shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1) [defining "preferential consideration"].) Section 361.3, subdivision (a), sets forth a nonexclusive list of factors

12.

for the social worker and the court to consider in determining whether placement with a relative is appropriate. These factors include, among other things, the best interests of the child; "[t]he nature and duration of the relationship between the child and the relative"; the ability of a relative to provide a home and the necessities of life for the child; and the safety of the relative's home. (§ 361.3, subd. (a)(1), (6), (7)(C), (8).)

The statute further provides that relatives "desiring placement shall be assessed according to the factors enumerated in this subdivision." (§ 361.3, subd. (a).) "The county social worker shall document these efforts in the social study prepared pursuant to Section 358.1." (*Ibid.*) After disposition, "whenever a new placement of the child must be made, consideration for placement shall again be given … to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements. In addition to the factors described in [section 361.3,] subdivision (a), the county social worker shall consider whether the relative has established and maintained a relationship with the child." (*Id.*, subd. (d).)

When section 361.3 applies to a relative-placement application, the juvenile court exercises its independent judgment rather than reviewing the social worker's recommendation for abuse of discretion. (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033 (*Cesar V.*).)

We review the juvenile court's determination for abuse of discretion. (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 863 [review of custody placement order]; *In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187 [review of order denying continuance of § 366.26 hearing].) This means we view the evidence in a light most favorable to the juvenile court's determination, and we do not interfere unless we conclude that no judge reasonably could have made such a determination. (*Alicia B. v. Superior Court*, *supra*, at p. 863.)

Father argues that the DHS failed to conduct the assessment of J.H. and L.H. that was required under section 361.3.**6** We first observe that father incorrectly asserts he told the court that J.H. and L.H. had not received the pamphlet they were supposed to receive, and the juvenile court simply asked the DHS to follow up. The record shows that, at the hearing on March 22, 2012, father was referring to *his* parents, not the maternal grandparents.

At the same hearing, the social worker told the court that the DHS had not received fingerprints or medical clearances from the people living in the maternal grandparents' home, and the juvenile court observed that the burden was on the applicants to move forward. To the extent father challenges the court's conduct at this hearing, we see no abuse of discretion. While it was the DHS's duty to investigate the maternal grandparents' relative-placement application, we agree that it was the applicants' burden to provide the necessary fingerprints. Indeed, the children could not be placed with the maternal grandparents until a criminal background check had been completed. (See § 361.3, subd. (a)(8) ["For a relative to be considered appropriate to receive placement of a child under this section, the relative's home shall first be approved pursuant to the process and standards described in subdivision (d) of Section 309"]; § 309, subd. (d) [assessment of suitability includes "consideration of the results of a criminal records check"].) In addition, the DHS followed up on the status of the maternal grandparents' application for placement, both with the applicants and with the court. After L.H.'s fingerprints were rejected, the DHS called the applicants and told J.H. that L.H. needed to redo her Live Scan fingerprinting. The DHS later prepared a memorandum to the court and the parties documenting the status of the application, including the fact that L.H. had not yet resubmitted fingerprints for Live Scan.**7**

---

**6**As we have noted, mother joins in all of father's arguments.

**7**In any event, it appears that L.H. eventually completed Live Scan. The maternal grandparents' original application was deemed withdrawn because they could not provide

14.

Father asserts the present case is analogous to *Cesar V.*, *supra*, 91 Cal.App.4th at page 1033, in which the appellate court concluded that "the social worker did not make significant efforts to gather the required information before deciding [the relative applicant] was unsuitable and abandoning the assessment." We disagree. Here, the record does not show that the DHS failed to make significant efforts to gather the required information. Rather, the record shows that the DHS followed up when L.H.'s fingerprints were rejected by Live Scan and followed up regarding whether the landlord would allow additional tenants in the maternal grandparents' apartment. Father claims the DHS did not conduct an appropriate evaluation of the maternal grandparents, but we agree with the DHS that "the assessment was derailed when the grandparents were unable to provide a residence in which the children could be placed."

Ultimately, the issue is whether the juvenile court abused its discretion by not granting a continuance and requiring the DHS to conduct a further assessment of the maternal grandparents. After hearing testimony from J.H. and L.H., the court found that they did not have an acceptable home because their landlord would not allow them to take in additional occupants. The court concluded, "that precludes them under the circumstances presented here," and denied the requested continuance. Implicit in the court's ruling is a determination that the maternal grandparents were not a suitable placement under section 361.3 and, consequently, no further assessment was necessary. Viewing the evidence most favorably in support of the juvenile court's determination, we find no abuse of discretion. J.H.'s and L.H.'s testimony established that their landlord would not allow additional tenants. Thus, they were unable to "[p]rovide a home" for the children. (§ 361.3, subd. (a)(7)(C).)

---

proof that their landlord would allow additional tenants in their apartment. L.H. also testified that she submitted fingerprints on three or four occasions. This suggests that the DHS (1) received a completed application packet (including criminal background check), (2) assigned a social worker from the RAU to conduct a home assessment, and (3) at that point, learned about the landlord issue.

## *<u>DISPOSITION</u>*

The juvenile court's order is affirmed.