Filed 5/8/23 In re R.G. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.G., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G061682 |
| Plaintiff and Respondent, | (Super. Ct. No. 20DP0838) |
| v. | O P I N I O N |
| M.M. et al., | |
| Defendants and Appellants. | |

Appeal from orders of the Superior Court of Orange County, Vibhav Mittal. Affirmed.

Law Office of Robert McLaughlin and Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant mother, M.M.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant father, N.G.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

\*　　　\*　　　\*

M.M. (Mother) appeals from the juvenile court's denial of her modification petition under Welfare and Institutions Code[1] section 388. Through the petition, she sought to have her four-year-old daughter, R.G., returned to her custody based on her belated efforts to address her mental health difficulties. In the alternative, Mother requested that reunification services be reinstated. The court found Mother did not meet the two-prong test necessary to grant the modification petition and therefore conducted the permanent plan selection and implementation hearing under section 366.26 (.26 hearing). At that hearing, the court determined R.G.'s interests were best served by a legal guardianship under the care and custody of her maternal aunt and uncle, with whom she had resided since she was nearly two years old.

N.G. (Father) and Mother do not appeal the guardianship decision, but both challenge the court's orders providing for their continued visitation with R.G. during the guardianship. As we explain, the parents failed to meet their burden to demonstrate the juvenile court abused its discretion in denying the modification petition or in setting visitation terms. We therefore affirm the orders.

### FACTUAL AND PROCEDURAL BACKGROUND

R.G. came to the attention of social workers when Mother repeatedly brought her to medical professionals for tests and other interventions that the doctors and nurses determined were "unnecessary, invasive, and possibly physically harmful." On

---

[1] All further statutory references are to the Welfare and Institutions Code.

one hospital visit, Mother's unfounded concerns included that R.G. had been injured by an epidural Mother received 22 months earlier. She also described R.G. as "very combative" and "defiant," contrary to staff observations, and she admitted giving R.G. a sleeping pill daily, which she was informed was "dangerous."

Mother would abruptly depart one healthcare provider "without discharge instructions" and move to the next. For example, after a hospital found her treatment demands unfounded, she asked her pediatrician to test R.G. for narcotics and lead toxicity and, when that was refused, she took R.G. to the Children's Hospital of Orange County (CHOC) for a spinal tap because she was "sympathetic [*sic*: symptomatic] of meningitis." When CHOC refused to subject R.G. to that invasive procedure, Mother tried—again unsuccessfully—to obtain toxicology screening at an emergency room, where she and R.G. presented as "disheveled and dirty," and Mother said they were living on the streets.

Multiple medical professionals recommended that Mother seek psychiatric evaluation and treatment based on symptoms that included paranoia, "pressured speech and some flight of ideas," and her perseveration on groundless medical claims.

Recent family contact with child protection services included, as we observed in an earlier opinion in this matter, "an allegation of general neglect, due to domestic violence, against Father." (*In re R.G.* (G059645, June 28, 2021) [nonpub. opn.].) This 2019 allegation did not result in dependency proceedings or other official action at the time, but in June 2020, the family court granted Mother a restraining order against Father. (*Ibid.*) While Father later claimed he was aware of Mother's deteriorating mental health, he apparently did not raise any concerns in the family court proceeding about protecting R.G. from Mother, or otherwise seek to safeguard her. The family court's order gave sole legal and physical custody of R.G. to Mother and required Father to attend a 52-week batterer intervention program. (*Ibid.*)

Later that month, Mother arrived at an emergency room with R.G. in tow, commencing the series of hospital visits for unnecessary medical care that led to

3

intervention by the Orange County Social Services Agency (SSA, or Agency). (*In re R.G.*, *supra*, G059645.) SSA filed a dependency petition based on both parents' failure to protect R.G. (§ 300, subd. (b)) from the risk of harm from Mother's unstable mental health, the couple's history of domestic violence, Father's own mental health problems, and unresolved substance abuse issues. (*Ibid.*) Mother did not contest the allegations, which the juvenile court sustained as to both parents. (*Ibid.*)

Father appealed the juvenile court's jurisdictional and dispositional orders, which this court affirmed on all grounds, including the risks presented by Father's failure to protect R.G., his own anger management and mental health issues, his role in the domestic violence issues, and substance abuse concerns. (*In re R.G.*, *supra*, G059645.) We upheld the juvenile court's order requiring a psychological exam for Father under section 730 and found no abuse of discretion in the court's placement of R.G. in Redlands with her maternal uncle and aunt. (*Ibid.*)

Mother's progress on her case plan during the initial six-month period of reunification was poor. She discontinued counseling services with a licensed provider in favor of an unlicensed one, denied needing mental health services altogether, and, after SSA reminded her of her case plan terms, the 15 sessions she spent with a licensed provider yielded little. According to the counselor, Mother's "rigid thought process" interfered with "discussing legal timelines or services," inhibiting progress.

A court-ordered Evidence Code section 730 evaluation found Mother suffered from borderline personality disorder (BPD); the psychologist noted "considerable overlap" in Mother's BPD diagnosis with bipolar disorder and could not rule out a variation of delusional disorder with somatic and paranoid features. Mother's "affective instability" was evident in "transient-stress-related paranoid ideation." She was also "very enmeshed" with R.G. to the point she "confuses their symptoms and projects her fears on the child." Her other relationships showed "a pervasive pattern of conflict and instability," including "alternating idealization/dependency and devaluation,"

4

yet Mother presented herself "as satisfied with herself as she is," seeing "little need for changes in her behavior."

Mother resisted her drug testing requirement, gave conflicting statements about abstaining from marijuana use; she enrolled but then withdrew from a perinatal drug treatment program. R.G.'s caregivers initially supported Mother reunifying with the child, but later reported problems due to Mother's harassing and aggressive conduct. After Mother threatened to abscond with R.G., her next several visits were monitored by a social worker. For his part, Father refused to participate in his case plan while he appealed the juvenile court's jurisdictional findings. He rarely visited R.G. and, when he did, he left early.

Meanwhile, R.G. thrived in her placement. She remained nonverbal, but Mother and Father would not consent to a speech assessment. SSA therefore requested that educational decisions be transferred to her caregivers. Thereafter, R.G. qualified for services at the Regional Center. SSA's report for the six-month review hearing recommended terminating reunification services due to the parents' minimal progress, but the parties stipulated to extending services for another six months, and the juvenile court assented.

Mother's reunification efforts did not improve during the second review period. She revoked consent for her therapist to release information to SSA, and then the counseling sessions ceased altogether because Mother refused to participate. Mother rejected additional referrals in favor of seeing someone she knew with no formal training. Mother obtained a letter from another provider stating she did not need substance abuse treatment, but she would not allow the social worker to confirm the assessment with the provider.

While a social worker no longer monitored Mother's visits with R.G., her request for visitation without supervision by the caregivers was denied; she effectively thwarted social worker evaluation of the visits by declining to give advance notice.

5

Mother refused to respond to Regional Center inquiries regarding R.G., and she would not agree to or facilitate a school district speech services evaluation. Mother then claimed to be confused why the assessment had not been completed and attributed R.G.'s removal from her custody solely to R.G.'s speech delay.

Father's visitation remained infrequent, and he chafed at the supervision requirement. He demanded that R.G. be returned to his custody but admitted he did not have the "stable environment" necessary to care for a child. He refused to comply with the section 730 evaluation ordered by the court. Nor would he provide full releases for his service providers to share information with SSA, and his therapist's treatment plan did not encompass case plan specifics like addressing domestic violence.

Testimony at the 12-month review hearing included the social worker's assessment that Mother showed no change in behavior. "Similar to what happened" when Mother would shuttle R.G. among medical providers when she did not receive the testing or answers she wanted, Mother "wanted to control the information" given to reunification services providers, "and when she was not able to, she decided to end services." Mother did not articulate anything she learned from the services in which she participated. She would speak over the social worker when she attempted to update Mother about R.G.'s medical appointments, preventing the information from being conveyed. Father also continued to show symptoms of unresolved mental health issues, remaining aggressive, threatening, and compulsive in his interactions with the social worker.

Mother and Father both testified at the review hearing, but the juvenile court did not find their testimony credible. As to Father's reunification efforts, the court concluded that "minimal is a generous term for what the father did in this case." As we discuss more fully below, the court made extensive findings regarding Mother's lack of progress. The court found no substantial probability that R.G. could be returned safely to either parent by the date of an 18-month review, and consequently terminated

6

reunification services and set a .26 hearing to select a permanent plan for R.G.[2] Before concluding the hearing, the court granted the parents' requests for an expert to observe visits by each parent with R.G. but left it to the parents and counsel to select a suitable expert.

Finally, faced with the reality of SSA's recommendation to terminate her parental rights, Mother began to seek a licensed therapist more than a year and a half into the dependency. Finding one she believed was a "fantastic fit," Mother had 11 telehealth sessions with Melissa Wright, a licensed marriage and family counseling therapist. Mother also retained a psychologist, Dr. Alfredo Crespo, to evaluate her psychological condition and to observe her and R.G. interact together in an hour-long session. Mother consistently visited R.G. and the visits with the child were positive, though the caregivers felt harassed by excessive texts and e-mails Mother sent to them and to the caregiver mother's parents.[3]

Mother then filed a section 388 petition requesting that the juvenile court return R.G. to her custody or, in the alternative, liberalize visitation and reinstate reunification services. SSA and R.G.'s counsel opposed the petition, but the juvenile court found Mother made a prima facie case sufficient to warrant an evidentiary hearing.

Meanwhile, Mother had the family court restraining order she obtained against Father "dropped," but her attempt to terminate the protective order in the criminal battery case still pending against Father was denied. According to Father, he and Mother were no longer pursuing divorce and instead wanted to be a "happily married couple."

[2]    Following the hearing, Father filed notice of his intent to file a writ petition to challenge the juvenile court's findings and orders (Cal. Rules of Court, rule 8.452), but counsel subsequently filed a statement withdrawing the petition under *In re Sade C.* (1996) 13 Cal.4th 952 for lack of any arguable issue.

[3]    Mother's concerns about the caregivers included becoming upset when R.G. had to take a "time out" during her video calls, which Mother viewed as "leverage" or "blackmail" deployed against her.

Father briefly moved into an apartment Mother shared with a friend, but the arrangement only lasted about a month. There was no evidence Mother or Father addressed the domestic violence allegations the juvenile court earlier sustained.

At the evidentiary hearing, Wright testified she did not believe Mother suffered from BPD, but instead viewed Mother's conduct precipitating the dependency as an "adjustment disorder," i.e., "an emotional response to stress," "not a mental illness." In any case, while acknowledging she was not qualified to administer or interpret psychological exams herself, and had not done so with Mother, Wright attributed prior delusional thinking or psychosis Mother may have exhibited to a "medical condition" that "has since been treated and continues to be treated." Mother did not give Wright access to her medical records. Wright did not confirm with Mother's physician or others that Mother suffered from thyroid or other hormonal conditions, or that she received treatment; Wright "ha[d]n't felt that [she] needed to," relying instead on Mother's self-reporting.[4]

Wright conceded Mother's threat to abscond with R.G. was problematic, but she suggested it was only a response by a "desperate mother under stress." According to Wright, Mother characterized her relationship and family history with her brother, R.G.'s caretaker, as "contentious."

Wright was not aware Mother and Father had resumed their relationship. To the contrary, Mother had told Wright she did not want to revive the marriage. Wright did not address domestic violence in her counseling sessions with Mother.

Mother scored within the "disorder range" in testing by Dr. Crespo which targeted personality disorders. This was despite the "limited" usefulness of self-administered portions of the evaluation, which were "invalidated" by Mother's

---

[4] Mother told Wright she ceased using marijuana, but she admitted in her testimony at the hearing that she failed the self-imposed reduction she attempted in her self-administered "dosage" of a "tincture" of marijuana.

8

"defensive posture" and her responses disclosing an attempt to appear "socially desirable." Such invalidation was not uncommon due to subjects not wanting to present as "psychotic or extremely troubled." Nevertheless, Dr. Crespo explained that the testing did not make clear whether "turbulence" indicative of a disorder was "circumstantial" or "created by the person."

Dr. Crespo testified that while the section 730 evaluation performed by Dr. Rogers was "significant," it provided only a "glimpse" of the circumstances at the time. Although her thinking was a "little" disorganized, Mother did not exhibit paranoia or erratic behavior in her virtual sessions with Dr. Crespo. Dr. Crespo opined that Mother did not suffer from BPD, schizophrenia, bipolar disorder, substance abuse disorder, or narcissistic disorder.

Observing Mother and R.G. interact during a session at his office, Dr. Crespo found R.G. had a "secure attachment" with Mother, and Mother was "definitely" bonded with the child. R.G. was comfortable with Mother, responded positively to her, took guidance from her, and accepted limits set by Mother.

The social worker testified that while Mother appeared to finally be taking steps towards change, she still exhibited the traits that were the basis for concern and risk, whether she was diagnosed with a formal disorder or not. Her reactivity remained high with the social worker and others; she had to be directed not to contact the caregivers, and to only communicate through the social worker; she did not regain permission for direct contact because she would engage her brother in, "for lack of a better word," "e-mail wars."

Personnel at R.G.'s school also complained to the social worker about the difficulty of dealing with Mother; she continued to blame others, including the caregivers, demeaning them in e-mails to third parties; her controlling patterns persisted, including hiding her reunification with Father; she "resist[ed] topics where she" did not like the answer given, and, as before, was resistant to direction or oversight, "continually

9

wanting things her way or what she thinks is best." Small concerns would still "spiral" out of control, and larger concerns, such as the sustained domestic violence findings, remained unaddressed. Mother actively sought to remove the protective orders, yet neither parent could articulate anything they learned to prevent future altercations.

At the conclusion of the testimony and following argument by counsel, the court continued the case for several days; when proceedings resumed, the court explained it was "denying the 388 petition" but, contrary to SSA's recommendation, would apply "the parental benefit exception" to preclude terminating parental rights, and instead "order legal guardianship." The court recognized that while the caregivers were open to adopting R.G., her "foster mother testified that she would do what's best for" R.G. because they loved her and she "deserved a permanent home," which the court found guardianship "does offer" as the "next preferred plan" to adoption.

On Mother's section 388 petition, the court noted that, since termination of reunification services at the 12-month review hearing, "her demeanor appeared different, to some extent, and Mother should be commended for seeking therapy on her own." Nonetheless, the court concluded "the record is not sufficient to alleviate the concerns as to Mother seeking unnecessary medical procedures for [R.G.]."

The court observed that Mother did not "really engag[e] in [R.G.]'s medical decisions in the interim period," thus furnishing no evidence of improvement, and the court also found it relevant that, as to Mother's claimed "hormonal issues" that she suggested "were related to her mental health," Mother provided no evidence from an endocrinologist or other doctor "to address whether that was still a concern or not." While Dr. Crespo suggested "Mother may have experienced a psychotic episode prior to the minor being detained, and that this may be related to [a] thyroid disorder," the court noted, "again, there was no evidence from a doctor or any objective evidence" that such a disorder, if that was the problem, had been addressed and "was under control."

10

The court agreed with Dr. Crespo that "multiple stressors . . . may have contributed to Mother's psychotic episode," but "found insufficient evidence in the testimony and exhibits that were provided that if such stressors arose again, we would not have the same situation . . . ."

While Wright viewed Mother as suffering only from an "adjustment disorder," she nevertheless "agreed Mother had borderline personality traits," and those traits concerned the court, including "symptoms like delusional thinking and psychotic thoughts," even if they didn't devolve into psychosis. The court also found Mother did not "address the domestic violence concerns" with Wright. In particular, Wright "agreed that the parents needed counseling related to domestic violence if they resumed a romantic relationship," yet Mother kept that information from Wright.

The court observed that such omissions in the record "actually raise[] more questions than answers." The court concluded that even if circumstances were "changing," the changes would "require significant services to address now what appears to be a path towards reconciliation between the parents." Father, for example, never followed through on his "previously ordered . . . 730 evaluation," even though Dr. Crespo had "recommended, among other things, an in-depth assessment of Father's mental health before [R.G.] could be returned." These "mental health concerns" remained for "both parents," particularly when neither met their evidentiary burden to provide any evidence they learned how to protect R.G. from domestic violence.

In reviewing the "significant visitation evidence admitted at trial," the court noted there was evidence that R.G. "was calling for Mother at school" and that, "even two years" after her detention, "the parents are having positive interactions with the minor." The court noted "evidence of the parents . . . doing things beyond just being fun caretakers" during visits with R.G. Mother "redirect[ed] the minor when engaging in unsafe behavior," and Father instructed R.G. after an outburst, "'You can't tell a family member that you hate them.'" Further, "even in" virtual visits, the court found the

11

parents showed "the ability to engage the minor and stay focused on her and her on them," that "speaks to the bond that's clearly apparent." For these and other reasons, the court found "the parental benefit exception [to termination of parental rights] applies."

Nevertheless, the court found it was not in R.G.'s "best interest to return to the parents, given what the court views are changing circumstances." The court explained that two years into placement with her foster caretakers, R.G. "deserves permanency" that the parents had not shown they could provide, in failing to meet "the first prong" of the requisite "change of circumstances or new evidence" in the factors leading to dependency. The court concluded that "while [it] does believe there's a benefit for [R.G.] to have a relationship with her parents," it did not outweigh the benefits she gained in her "relationship with her current foster parents and her cousins that live in that home." To the contrary, the permanency she would gain under their legal guardianship was in her best interests overall.

The court continued the hearing for SSA to draw up the legal guardianship papers, and once those were finalized, the court selected guardianship as R.G.'s permanent plan and set the parents' visitation at two three-hour visits a month. Both parents now appeal.

## DISCUSSION

### A.    *Section 388 Petition*

Mother contends the juvenile court erred in denying her modification petition. We review the ruling for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (*Stephanie M.*).) This standard is "highly deferential to the decision maker," requiring "a showing that the decision was 'so irrational or arbitrary that no reasonable person could agree with it.'" (*In re M.L.* (2012) 205 Cal.App.4th 210, 228.) Mother does not meet that high standard here.

12

"A juvenile court dependency order may be changed, modified, or set aside at any time." (*In re J.C.* (2014) 226 Cal.App.4th 503, 525 (*In re J.C.*).) "A parent may petition the court for such a modification on grounds of change of circumstance or new evidence. [Citation.] The parent, however, must also show that the proposed change would promote the best interests of the child." (*Ibid.*) As the moving party, the parent bears the burden of proving both prongs, i.e., changed circumstances and the best interests of the child. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

"[R]ewarding [a parent] for [his or] her hard work and efforts to reunify" is not the purpose of a hearing on a modification petition. (*In re J.C., supra,* 226 Cal.App.4th at p. 527.) To the contrary, "after the court has . . . terminated reunification services and set the matter for a section 366.26 hearing, the focus of the case shifts from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability." (*In re N.F.* (2021) 68 Cal.App.5th 112, 121.) "'[G]iven the unique developmental needs of infants and toddlers, moving to permanency more quickly is critical.'" (*Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 612 (*Daria D.*).) "[V]ery young children . . . require a more timely resolution of a permanent plan because of their vulnerable stage of development." (*Ibid.*) Thus, "[n]ot every change in circumstance can justify modification of a prior order." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

Here, the evidence and the court's findings at the 12-month review hearing, which had been held nearly 17 months after R.G.'s detention, were striking. Mother could not "safely have [R.G.] in her custody," as the social worker explained in her testimony, because Mother's mental health remained a concern in that she was "so quick to get angry," was "more concerned about controlling the situation [than] the well-being of the child," and demonstrated an unwillingness to listen and "inability to follow the advice of others." Unfortunately, these concerns proved to be prescient when Mother obstructed efforts to have R.G.'s speech delay assessed, thus delaying those services.

13

The court cautioned at the 12-month review hearing that a parent's mental health is critical in ensuring child safety because "a doctor has to rely on the parents' description of [the] child's symptoms." At the outset of the case, "thankfully, the doctors rejected . . . those requests" that would "physically harm" R.G., but other issues such as "giving the child a sleeping pill" at home would depend entirely on Mother. This included whether she would take input from others or continue "challenging" them to do things her own way. As the court observed, such conduct presents not only a physical, medical threat, but "is emotionally taxing for a child."

Laudably, Mother found Wright after the 12-month review hearing; however, she did not have her first session with Wright until almost four months later. It is true that Wright differed with Dr. Rogers over whether Mother suffered from BPD, but Wright acknowledged Mother exhibited "rapid flight of ideas," pressured speech, "cognitive distortion," and "black-and-white thinking" leading to rigidity in her decision-making and "instability" in her interpersonal relations. These and similar continuing traits remained the core of the court's concern, regardless of the diagnostic label.

Similarly, while Dr. Crespo to some degree minimized Dr. Rogers's section 730 evaluation as only a "glimpse" into Mother's mental health, the same was true of his limited assessment, which nevertheless disclosed her "defensive posture," her testing results in the "disorder[ed] range," and some "disorganized" thinking. This "disorganization" did not rise to the level of the psychosis that Mother previously experienced, but, as the trial court observed, Mother did not provide Dr. Crespo, Wright, or the court with any medical records showing she obtained treatment for the hormonal issues to which she attributed her prior conduct.

The court reasonably could find such omissions troubling. Absent evidence of treatment, the court had little assurance Mother's prior disintegration would not recur. The evidentiary gap was also consistent with a pattern in which Mother continued to try

14

to control diagnostic outcomes or, at a minimum, interfered with ensuring accurate and trustworthy diagnoses and treatment by withholding consent or information.

In another example, Mother told Dr. Crespo she planned to have a child with Father, but, in her sessions with Wright, she not only omitted that fact, she denied any intent to reunify with him. This had treatment ramifications as Wright did not address domestic violence in her sessions with Mother, and neither Mother nor Father provided any evidence they learned how to protect R.G. from domestic violence.

"'[C]hanged circumstances'" means that the problems leading to the dependency have been resolved or eliminated. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 592.) Mother minimizes domestic violence as a "lesser contributing factor to the initiation of the dependency proceedings." But the scourge of domestic violence cannot be underestimated. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.) As Dr. Rogers explained in her report, R.G. had been "exposed to a great deal of chaos, instability, conflict, screaming, and yelling at a minimum"; such "chronic fighting in the home, if continued, could place the minor in physical danger, even if not intentional, and at a minimum will negatively influence her mental and emotional development."

Despite Wright's efforts with Mother on her "reactivity" with others, Mother's destructively negative interactions with the two people closest to R.G. and R.G.'s daily well-being—her caregivers—remained unimproved. Mother never regained even e-mail contact with them, and thus cut herself off from, for example, updates about R.G.'s current physical, social, and emotional health. Such information would be relevant to any parent's informed medical or other decision-making for his or her child, if the necessity arose, but Mother did not prepare herself to be that decisionmaker.

On this record, we will not second-guess the trial court's section 388 ruling. Under the abuse of discretion standard, "'[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*Stephanie M.*, *supra*, 7 Cal.4th at p. 319.) Mother did not

15

meet her burden to show a change in circumstances sufficient to safely return R.G. to her custody.

Mother argues the juvenile court should have alternatively granted her request for reinstatement of reunification services to address its remaining concerns. We disagree. Twenty months after R.G. had been detained and placed with the caregivers, Mother began treatment with Wright, compressing 11 sessions into nine weeks. While commendable, this belated response created its own concerns, including whether any gains made in a short period of time would endure, as the social worker testified.

"The fact that the parent 'makes relatively last-minute (albeit genuine) changes' does not automatically tip the scale in the parent's favor." (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512.) Here, section 361.5, subdivision (a)(1)(B), specifies that "[f]or a child who, on the date of initial removal from the physical custody of the child's parent or guardian, was under three years of age, court-ordered services shall be provided for a period of 6 months from the dispositional hearing . . . ." This period may be extended "no longer than 12 months from the date the child entered foster care . . . unless the child is returned to the home of the parent or guardian." (§ 361.5, subd. (a)(1)(B).) This "truncated time frame is an acknowledgment that where parents fail to regularly participate in reunification services from the outset, despite a warning services may be discontinued absent compliance, a very young child's needs for permanency and stability cannot be postponed without significant detriment." (*Daria D.*, *supra*, 61 Cal.App.4th at p. 613.)

Mother ran out of time. R.G. was long overdue for permanency. Despite the difficulties a parent may face, "'[c]hildhood does not wait for the parent to become adequate.'" (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) Changing, as opposed to changed, circumstances are insufficient. (*Ibid.*)

Mother suggests that uncertainty at the hearing on the section 388 petition as to whether the caregivers would consent to a guardianship cracked the door open for

16

the court to consider whether R.G.'s best interests might include returning R.G. to Mother. But the maternal uncle's testimony that he would have to speak with his wife about guardianship as opposed to adoption did not require this conclusion. The juvenile court accurately assessed, based on the wife's testimony, that the couple was committed to R.G., whether by adoption or guardianship. We cannot say the juvenile court abused its discretion in denying Mother's modification petition to extend reunification services further.

B.    *Visitation*

Mother and Father challenge the juvenile court's order for each to have two three-hour visits per month with R.G. while under her uncle and aunt's guardianship. Mother contends that given her "dysfunctional relationship" with the guardians, the visitation order "amounted to an unlawful delegation" of the court's authority over visitation. Father likewise argues his visitation "could easily be thwarted" by the guardians "[d]ue to the strained relationship." In particular, he expresses concern that, having to drive 70 miles and up to two hours each way for a visit, the court "provided no mechanism for the parents to still have a visit should the guardians pick an unfeasible date and time."

These concerns are unavailing for several reasons. First, they are premature since the juvenile court has not yet issued exit orders terminating the dependency (§ 362.4), but instead set a six-month periodic review hearing. The court did so precisely to monitor R.G.'s and the parties' adjustment to the guardianship, particularly on the issue of visitation. As the court explained, "[I]t's in everyone's best interest to figure out a system that works." As such, prospective complaints about what the guardians *might* do are unripe given that the juvenile court continued its supervision. The parents thus have a "viable legal remedy" to seek the court's intervention to enforce its orders in the unlikely event that is necessary. (*In re Ethan J.* (2015) 236 Cal.App.4th 654, 660.)

17

Second, the juvenile court did not unlawfully delegate its authority over visitation to the guardians. *In re M.R.* (2005) 132 Cal.App.4th 269, on which Mother and Father rely, held that the juvenile court may not "delegate authority to the legal guardians to decide *whether* visitation would occur." (*Id.* at p. 274, italics added.) But the court also recognized it is proper for the guardians "to decide the time, place, and manner in which visitation will take place." (*Ibid.*) In other words, these details "may be left to the legal guardian[s], but leaving the frequency and duration of visits" to the guardians' discretion is prohibited because it "allows [them] to decide whether visitation actually will occur," which is the court's responsibility in making visitation orders. (*In re Rebecca S.* (2010) 181 Cal.App.4th 1310, 1314; § 366.26, subd. (c)(4)(C); see *In re M.R.*, at pp. 274-275 [directing juvenile court to issue a visitation order specifying both "the frequency and duration of [parents'] visits"].)

The juvenile court met these requirements, as Mother concedes, but she argues "this is not a normal case" based on her fears the guardians will seek to eliminate her from R.G.'s life. The court's visitation order is in place to prevent that. There was no evidence the caretakers would flout the court's order. Instead, while they had wanted to adopt R.G., they testified they would "do what's best for [her]," including providing her "a permanent home," even under a guardianship, rather than relegating her to the foster system. The evidence showed the guardians honored the court's visitation orders throughout the dependency and encouraged R.G. to visit with her parents.

Father cites as the basis for his fears the fact that the maternal uncle testified that he did not trust the parents, and other factors that reflect poorly *on the parents not the guardians*, including the maternal aunt's testimony that R.G. found the parents' visits confusing, and they were draining on the caregivers' household. But the parents cannot set up their inability to manage their reactivity or poor interpersonal relations with R.G.'s guardians as a reason to challenge the court's visitation orders.

18

Mother also challenges the juvenile court's reduction of her visitation from six hours per week throughout most of the dependency proceedings to six hours per month now that R.G. is in her permanent home.[5] We review an order setting visitation during guardianship under the deferential abuse of discretion standard. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.) The court did not abuse its discretion here.

As a leading treatise explains, once "a legal guardianship is ordered, the case is no longer in reunification and the mandate for frequent parental visitation to facilitate reunification no longer applies." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2022) § 2.171[6][b], p. 2-754, citing § 362.1.) "Instead, the focus is on achieving and maintaining stability for the child." (*Ibid.*) Moreover, "most guardianships in dependency cases are ordered for children who are at or reaching the age at which school, extra-curricular activities, and childhood friends take on great significance and require increased time," such that the guardians and natural parents, like all parents, "often see their children less during these years of transition from childhood." (*Ibid.*) Guardians thus "must have a significant degree of flexibility and authority in their care, custody, and control of the child," including in the time allotted to visitation. (*Ibid.*) As such, the treatise explains that, where "the guardian and the parent do not get along," an order requiring "'visitation . . . to occur at least once per month for a minimum of four hours'" may be required, for example. (*Ibid.*)

These considerations apply here. R.G., at four years old, was on the cusp of beginning her school-age years and, now that she was in her long overdue permanent home, the juvenile court could reasonably conclude it was time to pare the parents' visitation hours, particularly where the trial period of increased visitation failed. Of

___

[5] The juvenile court briefly increased the parents' visitation to eight hours a week upon finding the benefit exception applied, presumably to see how R.G. would respond to increased parental contact, but the court quickly terminated the experiment when R.G. responded poorly.

course, implicit in the court's order for a *minimum* of two, three-hour visits per month is the possibility for additional visitation time at the guardians' discretion—if the parents demonstrate they are able to repair those relationships in furtherance of what they say are R.G.'s best interests in having more time with them. On the present record, the juvenile court did not abuse its discretion in crafting its visitation order.

## DISPOSITION

The juvenile court's orders are affirmed.

GOETHALS, J.

WE CONCUR:

MOORE, ACTING P. J.

MOTOIKE, J.

20