Filed 1/25/24  In re Nathan B. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re NATHAN B., a Person Coming Under the Juvenile Court Law. | B329228<br><br>(Los Angeles County Super. Ct. No. 20CCJP06644A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>VALERIE Z.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Cathy J. Ostiller, Judge. Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kelly G. Emling for Plaintiff and Respondent.

\* \* \* \* \* \*

In this juvenile dependency case, a mother challenges the juvenile court's order terminating her parental rights over her three-year-old son and prescribing adoption as his permanent placement. Because the juvenile court did not err in determining that the beneficial parent-child relationship exception to termination of rights did not apply, and because adoption—not legal guardianship—is the statutorily preferred option for placement, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. The Family

Valerie Z. (mother) and Brannon B. (father) are the parents of Nathan B. Nathan was born in February 2020.

Mother first started using methamphetamine when she was 14 years old, and by the time she was age 21, she was using methamphetamine daily. She continued to use until she was seven months pregnant with Nathan.

Mother and father have a tense relationship. In November 2020, they had a heated argument during which mother yelled, screamed, and struck the walls of their apartment, which

2

triggered a noise complaint to the police. Mother has also pulled on father's clothing to restrain him from walking away from her.[1]

## II. The Department Intervenes

In December 2020, the juvenile court detained Nathan from his parents and placed him with maternal aunt and maternal uncle (the caregivers).

A few days later, on December 17, 2020, the Los Angeles County Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over Nathan on the basis of (1) the parents' history of domestic violence (rendering jurisdiction appropriate under Welfare and Institutions Code section 300, subdivisions (a) and (b)),[2] and (2) mother's substance abuse (rendering jurisdiction appropriate under section 300, subdivision (b)).[3] At a combined adjudication and disposition hearing on

---

[1] Mother and father also suffer from mental health conditions: Mother was diagnosed with major depressive disorder as a teenager and father, a military veteran, has post-traumatic stress disorder and attention-deficit/hyperactivity disorder. Because the parents' mental health conditions did not directly give rise to the exertion of dependency jurisdiction over Nathan, we do not discuss them further.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3] The petition also alleged father's failure to protect Nathan from mother's substance abuse as well as father's own substance abuse issues with methamphetamine, marijuana, and alcohol. The juvenile court sustained those allegations, but because father is not a party to this appeal, we do not further discuss the allegations against him.

3

February 22, 2021, the juvenile court sustained the allegations, removed Nathan from his parents' custody, granted the parents monitored visitation, and ordered mother to (1) complete a drug/alcohol treatment program, (2) undergo weekly drug testing, (3) participate in a 12-step program with a sponsor, (4) join a domestic violence support group, (5) complete a parenting class, and (6) attend individual counseling.

III.   **Juvenile Court Supervision**

    A.   ***The six-month review period***

By August 2021, mother had successfully completed a parenting class and attended several online narcotics and alcoholics anonymous meetings, but she was terminated from her outpatient substance abuse program because she "did not comply with [the] program, struggled with program rules and struggled with her individual testing and random drug testing." During the six months between the combined adjudication and disposition hearing and August 2021, mother tested negative six times but failed to show for drug testing 12 times. She had not joined any domestic violence support group or attended any individual counseling sessions.

However, mother's visits with Nathan were "going well" and he would "become distressed" when mother left a visit. Nathan was also "thriv[ing]" with the caregivers, with whom he shared "a healthy bond."

At the six-month status review hearing on August 23, 2021, the juvenile court found mother's progress on her case plan to be "substantial" and continued her reunification services.

**B.** *The six- to 12-month review period and termination of reunification services*

By February 2022, mother was on a "discharge contract" with her substance abuse program to encourage her to take "responsibility in staying enrolled." She had relapsed and submitted to drug testing only by the program, but not by the Department. The program reported that mother had four positive tests for methamphetamine, five negative tests, and four missed tests. Mother had recently enrolled in a domestic violence program.

During this period, mother's visits with Nathan were "inconsistent." Although the caregivers tried to accommodate mother's schedule, she did not communicate and did not visit every week. The Department was concerned that mother's visitation amounted to only "the bare minimum" and the "quality" of her visits with Nathan were "poor" and "not adequate." Meanwhile, Nathan had "maintained a healthy bond and relationship" with the caregivers.

At the 12-month status review hearing on March 1, 2022, the juvenile court found mother's progress on her case plan had "not been substantial." The court terminated reunification services and set a permanency planning hearing.

**C.** *Reinstatement of reunification services*

On July 5, 2022, mother filed a petition under section 388 asking the juvenile court to reinstate reunification services or to return Nathan to her custody. Since creating a written schedule for visitation, mother's visits with Nathan had become more consistent. Nathan's therapist and a Department social worker observed that Nathan had an "attachment" to and "positive bond" with mother. He would "scream[] with excitement" and "glow[]"

5

when he saw mother and called her "mama." Nevertheless, Nathan was "very attached" to the caregivers, who provided him a "strong, loving and safe" environment; he called maternal aunt "mom." The caregivers also reported that they suspected mother was under the influence during some visits and that, in their opinion, mother would "giv[e] up and wait[]" for maternal aunt to step in and manage Nathan's challenging behavior. Mother still had not attended individual counseling.

On October 4, 2022, the juvenile court granted mother's petition and reinstated reunification services. The court also granted mother unmonitored visitation on the condition that she test clean, get a sponsor, and comply with her case plan.

### D. *Second termination of reunification services*

The Department later discovered that on September 29, 2022—less than a week before the juvenile court had granted mother's section 388 petition—mother had tested positive for methamphetamine. Five weeks later, mother told the Department that she could not complete her drug test on November 2, 2022; when she tested the next day, she tested positive for PCP. Mother claimed the tests results were "impossible," yet she thereafter stopped attending her substance abuse program. She still did not enroll in individual counseling.

Based on mother's noncompliance, the Department filed a petition under section 388 asking the juvenile court to terminate mother's reunification services, set a permanency planning hearing within 120 days, and limit mother to monitored visits with Nathan. The juvenile court granted the petition on January 9, 2023.

6

### E. *Termination of parental rights*

At the permanency planning hearing on May 8, 2023, the juvenile court found Nathan to be adoptable, identified the caregivers as his prospective adopters, and terminated mother's (and father's) parental rights. The court expressly found that the beneficial parent-child relationship exception did not apply to bar termination because, although mother "maintained regular visitation" with Nathan and showed "affection," she had "not established a bond" with him and because any benefit to Nathan from his relationship with mother was "outweighed by the physical and emotional benefit" he would receive through adoption—particularly "considering" mother had "not entirely gotten [her] situation in order"—specifically, her "substance abuse issues."

## IV. Appeal

Mother filed this timely appeal.

## DISCUSSION

Mother challenges the juvenile court's termination of her parental rights over Nathan on two grounds: (1) the court should have applied the beneficial parent-child relationship exception, and (2) the court should have ordered a less severe option (rather than adoption) as Nathan's permanent plan.[4]

---

[4] The Department makes the contention that mother forfeited these arguments by failing to raise them at the permanency planning hearing before the juvenile court. We reject this contention. Although mother's counsel did not invoke the beneficial parent-child exception by name, counsel's argument obliquely referred to the exception's elements. More to the point, the juvenile court understood the gist of counsel's argument, as the court elected to rule on the applicability of the

## I. The Beneficial Parent-Child Relationship Exception

Mother asserts that the juvenile court's determination that the beneficial parent-child relationship exception does not apply is based on (1) insufficient evidence, and (2) defects in analysis.

### A. *Sufficiency of the evidence*

Once a juvenile court has terminated reunification services, the court "shall terminate parental rights" if it finds, "'by clear and convincing evidence[,] that it is likely that the [child] will be adopted'" within a reasonable time. (§ 366.26, subds. (a) & (c)(1); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250.) Thus, a juvenile court must terminate parental rights and order adoption unless the parent opposing termination proves that one of six statutory exceptions applies. (§ 366.26, subds. (c)(1) & (c)(1)(B); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, overruled in part on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010 & fn. 7.)

The exception at issue here is the beneficial parent-child relationship exception. Because this exception "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child," a court will find the exception applicable only if the parent "establish[es]" "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 630, 631, 635 (*Caden C.*).) In assessing whether a child would benefit from a continued relationship with the

---

exception. In any event, we possess the discretion to reach the merits of forfeited arguments and exercise that discretion here.

8

parent, the parent must show "that the child has a substantial, positive, emotional attachment to the parent" in light of several factors, such as (1) "'[t]he age of the child, [(2)] the portion of the child's life spent in the parent's custody, [(3)] the "positive" or "negative" effect of interaction between parent and child, and [(4)] the child's particular needs.'" (*Id.* at pp. 636, 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) In assessing whether the termination of parental rights would be detrimental to the child "when balanced against the countervailing benefit of a new, adoptive home," a court is to examine "how the child would be affected by losing the parental relationship" entirely. (*Caden C.*, at pp. 633, 636-637.) This is necessarily a "subtle, case-specific inquiry." (*Ibid.*) We review a juvenile court's findings regarding the first two elements (visitation and relationship) for substantial evidence, and its ruling regarding the third element (balancing of detriment versus benefit) for an abuse of discretion. (*Id.* at pp. 639-641.) Because the parent challenging the termination of parental rights bears the burden of establishing the exception, that parent (here, mother) can prevail on appeal only if (1) the evidence in the record *compels* a finding in the parent's favor as a matter of law as to the first two elements of the exception (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1227; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 967); and (2) the juvenile court's conclusion that the termination of mother's parental rights would not be detrimental to Nathan was irrational and arbitrary (*In re M.L.* (2012) 205 Cal.App.4th 210, 227-228). This is a notoriously heavy burden to sustain.

Because the Department does not dispute the juvenile court's finding that mother had regular visitation and contact

with Nathan during the two and a half years this dependency case had been open, we focus on the last two elements of the exception.

Substantial evidence supports the juvenile court's finding that Nathan did not have "a substantial, positive, emotional attachment" to mother, such that the two lacked a substantial beneficial relationship. Most of the factors enumerated above as relevant to this element support this finding. Nathan was just over three years old at the time of the permanency planning hearing, and spent more than two of those three years with the caregivers. To be sure, Nathan did have a "bond" with mother: He called her "mama," expressed joy when seeing her, experienced loving visits, and, during the period immediately following his removal from mother's custody, was upset when their visits would end. But this bond—and even his love for mother—do not alone translate into the existence of a "substantial, positive, emotional attachment" that otherwise "suffices to establish the exception overall." (*In re J.D.* (2021) 70 Cal.App.5th 833, 857, fn. 17 (*J.D.*); *In re M.V.* (2023) 87 Cal.App.5th 1155, 1185 (*M.V.*) ["the second element is not, 'Is there a bond?'"].) Nathan also had particular behavior issues that warranted therapy, yet the caregivers noted that mother did not provide the type of supervision and intervention Nathan needed during her visits. Mother's ability or inability to occupy a "parental role" in helping Nathan address these issues, while not dispositive, is nonetheless relevant to the strength of the relationship between the parent and child. (See *In re B.D.* (2021) 66 Cal.App.5th 1218, 1228-1231 (*B.D.*); *J.D.*, at pp. 864-865; *In re M.G.* (2022) 80 Cal.App.5th 836, 848, 851 (*M.G.*); *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210 (*L.A.-O.*); *In re Katherine J.*

(2022) 75 Cal.App.5th 303, 319-320 (*Katherine J.*); *In re A.L.* (2022) 73 Cal.App.5th 1131, 1157 (*A.L.*).)  By highlighting only that evidence in the record showing their love for one another and ignoring the factors that cut against her, mother effectively asks us to reweigh the evidence in her favor—this, we cannot do. (*B.D.*, at p. 1225.)  At bottom, the record does not compel a finding that Nathan had a substantial, positive, emotional attachment to mother.

The juvenile court also did not abuse its discretion in concluding that the detriment Nathan would suffer from terminating his relationship with mother was outweighed by the stability and permanency that would come from adoption by the caregivers.  On the one hand, Nathan would not likely suffer much detriment if his relationship with mother was terminated given Nathan's lack of a sufficiently emotional attachment to mother.  Although Nathan may have been upset when mother would leave the visits during the first year of dependency supervision, there is no evidence that this behavior by Nathan continued thereafter or that Nathan would otherwise suffer detriment—or even be upset—by the cessation of his monitored visits with mother.  On the other hand, and contrary to what mother asserts is "not relevant," the benefit of terminating mother's relationship and allowing Nathan to be adopted by the caregivers—with whom Nathan has had a "strong, loving, and safe attachment" for years—is substantial.  On these facts, the juvenile court did not act irrationally in concluding that the benefit to Nathan outweighed the detriment.

B.    *Analytical defects*

Mother cites as defective three aspects of the trial court's analysis of the beneficial parent-child relationship exception.

11

First, she argues that the trial court failed to make specific findings in support of its ruling; more specifically, she assails the court for not making findings regarding the elements and subsidiary factors delineated in *Caden C.*, *supra*, 11 Cal.5th 614. This argument is meritless. There is no "requirement . . . that [a] juvenile court, in finding the [beneficial] parent[-child relationship] exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception." (*A.L.*, *supra*, 73 Cal.App.5th at p. 1156.) Mother asserts that, in the absence of express findings, we cannot be "certain" the court properly applied the *Caden C.* factors; for support, she cites *J.D.*, *supra*, 70 Cal.App.5th at p. 854 and *B.D.*, *supra*, 66 Cal.App.5th at p. 1222. This argument also lacks merit. Most fundamentally, mother's assertion effectively urges us to presume that the trial court got the law wrong, which flies in the face of one of the cardinal rules of appellate review—namely, that we presume lower courts "'know[] and appl[y] the correct statutory and case law'" absent "evidence to the contrary." (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) *J.D.* and *B.D.* are not to the contrary. Those cases both dealt with juvenile court rulings on the applicability of the beneficial parent-child relationship exception made *prior to Caden C.*, with appellate review occurring shortly *after Caden C.*'s clarification of the requirements of that exception; in this situation, an appellate court may well have concerns—in the absence of express findings—that the juvenile court may not have properly applied the law that did not yet exist at the time of its ruling. But that is not the situation here, where the juvenile court's ruling occurred years after *Caden C.*, and where we may justifiably presume the

court was aware of *Caden C.*'s nuances in the absence of any indication to the contrary.  Here, there was no such indication.

Second, mother argues that the juvenile court expressly relied on two improper factors.  (See *M.G.*, *supra*, 80 Cal.App.5th at p. 852 ["When a juvenile court bases its decision to terminate parental rights on improper factors, the . . . court abuses its discretion"].)  Mother begins by pointing to the court's reference to mother's ongoing substance abuse issues, but consideration of a parent's continued struggles is not always improper.  *Caden C.* and its progeny make clear that whether a parent has addressed the issues giving rise to dependency jurisdiction may not be relevant unto itself, but it is relevant to show the positive or negative effect of the parent's relationship on the child and, to a lesser extent, to the balancing of whether termination of that relationship would be detrimental to the child.  (*Caden C.*, *supra*, 11 Cal.5th at p. 639; *B.D.*, *supra*, 66 Cal.App.5th at p. 1228; *J.D.*, *supra*, 70 Cal.App.5th at p. 865; *L.A.-O.*, *supra*, 73 Cal.App.5th at p. 210; *Katherine J.*, *supra*, 75 Cal.App.5th at p. 318; *In re D.M.* (2021) 71 Cal.App.5th 261, 269-270.)  Here, the juvenile court's reference to mother's relapses was in reference to its analysis of whether Nathan would suffer a detriment from his loss of contact with mother, which was not improper.  Mother next faults the court for stating that it was "happy to hear that the caregivers are open to allowing" mother to continue to visit Nathan, but the context of the remark shows that it was also not improper.  The court made this remark after it completed announcing its rationale on the inapplicability of the exception and made this remark in connection with its decision to refer the case to the Consortium for Children (for families to enter into postadoption visitation agreements).  The court's ruling on the applicability of

13

the exception was not premised upon—and did not even factor in—the possibility of continued visits; as such, there was no error.

Third and lastly, mother argues that the Department did not fulfill a June 2022 order of the juvenile court to report on "the quality and quantity of the parents' visits" with Nathan as well as "information regarding the bond between the parents" and Nathan. (§ 366.21, subd. (i)(1)(B) [prior to permanency planning hearing, the Department must "prepare an assessment" that "review[s] . . . the amount . . . and nature of any contact between the child and their parents . . . since the time of placement"].) Mother ignores that the Department complied with this order across several reports, and especially did so in an August 16, 2022 Last Minute Information report that stated "despite" Nathan being "very attached" to the caregivers, he "has developed a positive bond with the parents," as demonstrated by his excitement to see them and identifying them as "mama" and "dada." (See *In re Megan S.* (2002) 104 Cal.App.4th 247, 251 [juvenile court, like appellate court, is required to consider "the entire record" in making its decision].) To the extent mother is asserting, for the first time on appeal, that the juvenile court should have conducted a bonding study before terminating her parental rights, mother is wrong. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339 ["[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent" to terminating parental rights]; *In re M.M.* (2022) 81 Cal.App.5th 61, 68-69, review granted Oct. 12, 2022, S276099.)

## II.    Legal Guardianship

Mother also contends that the juvenile court erred in selecting adoption as Nathan's permanent plan—rather than a

14

legal guardianship—because a legal guardianship would have been in Nathan's "best interest." This contention lacks merit. The juvenile dependency statutes do not treat all post-termination options as equally viable, or leave it to juvenile courts to choose which of those equally viable options is in a child's best interest. To the contrary, our Legislature has explicitly mandated that "'[a]doption is the . . . preferred permanent plan'"; "[g]uardianship is not to be considered as a permanent plan unless and until adoption . . . is not appropriate." (*M.V.*, *supra*, 87 Cal.App.5th at p. 1186.) It is not the court's role "to compare the pros and cons of adoption and legal guardianship and then choose between them." (*Ibid.*) Mother has not shown that adoption is not possible; her sole argument that adoption is not in Nathan's best interest is that, on balance, children are better off remaining in contact with their biological parents. This is insufficient by itself, as it exists in just about every dependency case; accepting mother's argument would make adoption the option of last resort rather than the preferred option. We are not in a position to rewrite the dependency laws.

## DISPOSITION

The order terminating mother's parental rights is affirmed. <u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
HOFFSTADT

We concur:

_____, P. J.
LUI

_____, J.
CHAVEZ